CERES ILLINOIS, INC., Plaintiff-Appellant, v. ILLINOIS SCRAP PRO-
CESSING, INC., Defendant-Appellee.

First District (3rd Division)   No. 84—572

Opinion filed December 12, 1984.—Rehearing denied March 13, 1985.

Lord, Bissell & Brook, of Chicago (Robert J. Pugliese and Hugh C. Griffin, of counsel), for appellant.

Michael P. Casey, of Edward R. Vrdolyak, Ltd., of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Ceres Illinois, Inc., brought this action seeking injunctive relief and money damages arising from the refusal of defendant, Illinois Scrap Processing, Inc., to vacate property used by defendant pursuant to an oral agreement. After a trial, the trial court denied the relief sought by plaintiff. The court found that there was an oral 15-year agreement between plaintiff's predecessor and defendant, and the court further held that plaintiff was estopped from raising the Statute of Frauds as a defense. Plaintiff appeals.

The Chicago Regional Port District owns property located at the mouth of the Calumet River known as Iroquois Landing Lakefront Terminus. In 1980, plaintiff's predecessor, International Great Lakes Shipping Company (INGLA), obtained a written license from the Port District which gave INGLA the exclusive right to use the western portion of Iroquois Landing. INGLA developed this 45-acre area as a port facility for Great Lakes and overseas. Plaintiff's parent company, Ceres Terminals, Inc., operates the eastern half of Iroquois Landing.

Defendant operates a scrap processing facility west of Iroquois Landing and adjacent to INGLA's facility. In early 1982, Seymour Pielet, defendant's president, discussed with Robert Palaima, INGLA's general manager, the possibility of defendant's using 6.7 acres of INGLA's Iroquois Landing facility for the storage of scrap. Pielet stated that defendant would pay INGLA $42,000 per year for either 15 years or an initial five-year term with two five-year options. Both parties anticipated that written documents would be prepared by their

lawyers to effectuate a final agreement.

After preliminary negotiations, INGLA and defendant sought the approval of the Port District. Attorneys for both parties exchanged drafts of agreements and learned that the Port District would require one-half of the $42,000. On June 25, 1982, defendant's attorney sent a draft letter to Palaima suggesting that he inform the Port District of INGLA's intent to lease 6.7 acres to defendant. The draft letter recited that the parties "have presently negotiated a tentative sublease." Palaima thereafter sent a letter to the Port District supporting defendant's application for a license to use the property. On July 26, 1982, defendant's attorney noted in his file that he told plaintiff's attorney that the lease proposal was not binding and that he would not allow his client to be bound before being assured that the railroad would allow access to the property. On August 6, 1982, the parties presented the proposal for defendant's use of a portion of Iroquois Landing to the Port District.

While negotiations for a written license agreement continued, Pielet asked Palaima if defendant could move scrap onto INGLA's property because of an overflow situation. After receiving approval from superiors in Philadelphia, Palaima told Pielet that defendant could come onto INGLA's property, pending the execution of a final agreement. Defendant agreed to pay $2,666.67 per month or $32,000 per year. That fee was derived from the present state of negotiations between INGLA, defendant, and the Port District.

On June 30, 1982, Palaima sent a letter to Pielet which confirmed the terms of the oral agreement between defendant and INGLA. The letter stated:

> "As per our recent discussions and as per agreement, the following will apply to the storage of your material on approximately six acres on the western end of our Iroquois Terminal.
>
> Commencing July 1, 1982, we offer 30 days free storage. Thereafter the fee will be $2,666.67 per 30 day period or fraction thereof.
>
> It is anticipated that prior to the end of July, the legal arrangements for your use of the above mentioned property will have been worked out among our Companies and the Chicago Regional Port District. It is understood that those arrangements and agreements, when mutually approved, will take precedence over this one."

Palaima testified that the storage arrangement between INGLA and defendant was on an interim basis. He stated that he agreed to allow defendant onto the property as a favor to alleviate the overflow

situation because of his friendship with Pielet. Palaima further testified that he did not wish to bind INGLA to any long-term arrangement until the lawyers completed the terms of the agreement dealing with easements, insurance, right to rail cars and berths, and indemnity and escalation clauses.

Pielet testified that the oral and written agreements were one and the same—that defendant would conduct a scrap operation on a portion of INGLA's property for 15 years at a cost of $2,666.67 per month. However, Pielet also testified that he expected the lawyers to draft documents setting out the terms of the license agreement and that the June 30, 1982, letter from Palaima accurately reflected the oral agreement by which defendant moved onto INGLA's property. Pielet further testified that the oral agreement was for an indefinite time period.

Pursuant to that oral agreement, defendant moved onto INGLA's property in June or July 1982, and in August began paying INGLA the monthly fee. In September 1982 defendant also began paying a monthly fee to the Port District. Around that time, defendant obtained INGLA's permission to build a foundation for a 70-ton Harris press that had been delivered to defendant in May. The concrete foundation was 30 feet long and six feet deep and took 45 days to construct. INGLA charged defendant for stevedoring and crane services used during the installation of the press. Defendant also obtained a certificate of insurance as requested by INGLA.

From the summer of 1982 to the spring of 1983, attorneys for INGLA, defendant and the Port District exchanged drafts of documents pertaining to defendant's use of Iroquois Landing. On February 19, 1983, defendant and the Port District signed a license agreement that was dated September 17, 1982. This agreement recited that defendant's right to use the real property was subject to the consent of INGLA. The term of the license was from November 1, 1982, to March 31, 1983, and defendant was given an option to extend it for three five-year terms, accompanied by an escalation in the license fee.

Although the attorneys for INGLA had exchanged drafts of a dock license and a consent to license between INGLA and defendant, INGLA never executed these documents. Through April 1983, defendant's attorney continued to request INGLA to execute the consent signed by defendant in February. At the same time, defendant's attorney still objected to insurance provisions in the dock license. Pursuant to Pielet's request, the Port District agreed to extend a railroad spur next to defendant's scrap operation on the Iroquois Landing Terminus and began construction. Defendant agreed to build a fence around the

property, but the fence was never erected because Pielet did not wish to build a fence until all the agreements were completed.

Ceres Terminal, Inc., purchased all the stock of INGLA in April 1983 and changed the company's name to Ceres Illinois, Inc. Plaintiff sent defendant monthly invoices for May and June 1983. Defendant's use of the property began interfering with marine terminal operations, which had increased after plaintiff's purchase of INGLA. Defendant's scrap materials had encroached beyond the 6.7 acres and hindered plaintiff's stevedoring services. Plaintiff complained that the dirt, soot and rust from defendant's scrap operations threatened to damage food, steel and other cargo. In July 1983, plaintiff advised defendant that it wanted defendant to cease using the premises. Plaintiff then wrote two letters to Pielet demanding that defendant remove its material and vacate the premises. When defendant did not comply, this action followed.

■■■ We hold that the trial court's finding that there was an oral 15-year agreement between plaintiff's predecessor and defendant is contrary to the manifest weight of the evidence. It is well established that where the reduction of an agreement to writing and its formal execution is intended by the parties as a condition precedent to its completion, there can be no contract until then, even if the actual terms have been agreed upon. (*S. N. Nielsen Co. v. National Heat & Power Co.* (1975), 32 Ill. App. 3d 941, 337 N.E.2d 387; *Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390, 256 N.E.2d 44.) In determining whether a party intended that a contract should be reduced to writing, a court can consider the following factors: whether the contract is one usually put into writing, whether there are few or many details, whether the amount involved is large or small, whether the agreement requires a formal writing for a full expression of covenants and promises, and whether negotiations themselves indicate that a written draft is contemplated as the final conclusion of negotiations. (*W. T. Grant Co. v. Jaeger* (1922), 224 Ill. App. 538.) Moreover, the intention of the parties to be bound contractually can be determined as a matter of law. See *Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 365 N.E.2d 1028.

It is clear that the parties here intended that the license agreement be reduced to writing and executed before entering a 15-year contractual relationship. Defendant's president, Pielet, stated that the lawyers would prepare written documents to formalize the agreement, which would be approved and signed by both parties. The letter sent by Palaima to Pielet on June 30, 1982, expressly stated the terms of

an interim storage agreement and indicated that a mutually approved written agreement would take precedence over the present one. Pielet testified that the June 30, 1982, letter accurately reflected the parties' agreement when defendant moved into INGLA's facility. Pielet also testified that the oral agreement by which defendant·was allowed onto INGLA's property was for an indefinite length of time.

The memoranda and letters of defendant's attorney further indicate that the parties did not intend to be bound contractually for 15 years when defendant moved onto INGLA's facility in June 1982. At that time, defendant's attorney referred to the arrangement as a "proposal" and "tentative." A memo in June 1982 stated that the license proposal was not binding and would not be signed until the railroad access was finalized. As late as February 28, 1983, defendant's counsel refers to "finalizing the provisions of the consent."

The complex type of agreement contemplated between the parties as well as the negotiations demonstrate that the parties intended that the 15-year license agreement would be formalized in a written signed document before a contract existed. The terms of the license consent included provisions concerning assignability, alterations to the premises, indemnity, mechanics' liens, access to berths and railroad spurs, and escalation clauses. The license agreement between the Port District and defendant, which was never finalized because it was subject to INGLA's consent, also contained extensive provisions corresponding to those in the consent to license. The parties anticipated that the documents be completed before they were contractually bound. Pielet himself testified that although defendant had agreed to erect a fence around the property, it did not want to do so until an agreement was made. The fact that the parties were still negotiating the terms and license in 1983 shows that there was no fixed long-term agreement between the parties. More importantly, INGLA never executed the consent to license or the dock license which the parties intended as a condition precedent to the formation of a 15-year contract.

The evidence clearly supported plaintiff's contention that as a matter of law there was not a 15-year license agreement between the parties. The negotiations produced no agreement; the requisite documents were neither completed nor signed. See *Chicago Title & Trust Co. v. Ceco Corp.* (1980), 92 Ill. App. 3d 58, 415 N.E.2d 668.

■■ ■ Since a 15-year oral agreement did not exist, defendant moved onto INGLA's facility on the basis of an indefinite-term oral agreement. An agreement that does not state or contain a definite time for termination is terminable at the will of either party. (*Gage v. Village of Wilmette* (1924), 315 Ill. 328, 146 N.E. 325; *Garber v.*

*Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 675, 432 N.E.2d 1309.) Thus, plaintiff acted within its contractual rights in terminating the oral agreement with defendant. Furthermore, the fact that defendant made certain expenditures with respect to its scrap operation in anticipation of a 15-year written agreement did not give it any additional contractual rights. See *Chicago Title & Trust Co. v. Ceco Corp.* (1980), 92 Ill. App. 3d 58; *Culbertson v. Carruthers* (1978), 66 Ill. App. 3d 47, 383 N.E.2d 618; *Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390.

■ Although we have decided that a 15-year agreement between the parties did not exist, even if it did, such an agreement would be barred by the Statute of Frauds. The Statute of Frauds requires that any agreement that is not to be performed within the space of one year from its making shall be in writing to be enforced. (Ill. Rev. Stat. 1983, ch. 59, par. 1.) Therefore, if a 15-year agreement existed, it was unenforceable under the Statute of Frauds.

■ ■ We find that there was no basis for the trial court's holding that plaintiff was equitably estopped from asserting the Statute of Frauds as a defense. In order to invoke the doctrine of equitable estoppel, the guilty party must exhibit words or conduct amounting to a misrepresentation or concealment of a material fact. (*Ozier v. Haines* (1952), 411 Ill. 160, 103 N.E.2d 485.) Here, there was no misrepresentation or concealment of material facts. Both parties had access to the same information regarding the present state of contract negotiations with the Port District. If defendant relied on the oral promise of INGLA, defendant acted upon its own judgment and its own risk.

■ ■ Defendant argues that INGLA and plaintiff induced it to establish a scrap processing operation at INGLA's facility. Yet, it was defendant who persuaded INGLA to allow it onto the facility before a written agreement could be completed. Moreover, the evidence disclosed that defendant continued to seek assistance from INGLA in dealing with the Port District, although the license and consent agreements were still being negotiated. INGLA did not induce defendant to purchase the Harris press, since it had been delivered to defendant in May 1982, two or three months before it was installed at Iroquois Landing. The fact that defendant made substantial investments in setting up its operation is not any evidence of inducement by plaintiff or INGLA. A party's decision to make expenditures and to change its position in reliance on an oral promise is an insufficient basis for equitable estoppel in the absence of fraud or misrepresentation. *Sinclair v. Sullivan Chevrolet Co.* (1964), 31 Ill. 2d 507, 202 N.E.2d 516;

806

*Libby-Broadway Drive-In, Inc. v. McDonald's System, Inc.* (1979), 72 Ill. App. 3d 806, 391 N.E.2d 1.

The authorities cited by defendant in which the doctrine of estoppel was applied are distinguishable in that they do not involve the Statute of Frauds or they address the issue of past performance. See *Gladville v. McDole* (1910), 247 Ill. 34, 93 N.E. 86; *Dale v. Groebe & Co.* (1981), 103 Ill. App. 3d 649, 431 N.E.2d 1107; *Perlin v. Board of Education* (1980), 86 Ill. App. 3d 108, 407 N.E.2d 792.

In summary, the trial court's judgment, based on its finding of a 15-year oral agreement, is contrary to the evidence and cannot stand. And, even if such oral agreement existed, it was unenforceable under the Statute of Frauds. Further, the trial court's holding of equitable estoppel was against the manifest weight of the evidence.

For the reasons stated, the judgment of the circuit court of Cook County is reversed and the cause is remanded for further proceedings consistent with the holdings of this opinion.

Reversed and remanded.

McGILLICUDDY and WHITE, JJ., concur.