(No. 61744

CERES ILLINOIS, INC., Appellee, v. ILLINOIS
SCRAP PROCESSING, INC., Appellant.

*Opinion filed September 17, 1986.—Rehearing
denied December 1, 1986.*

134

CLARK, C.J., took no part.

Michael P. Casey, of Edward R. Vrdolyak, Ltd., and William J. Harte, Ltd., all of Chicago (William J. Harte, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (Robert J. Pugliese and Hugh C. Griffin, of counsel), for appellee.

JUSTICE RYAN delivered the opinion of the court:

Defendant, Illinois Scrap Processing, Inc., refused to vacate property it had occupied pursuant to an oral agreement, and plaintiff, Ceres Illinois, Inc., sought permanent injunctive relief and money damages. The circuit court of Cook County concluded that the defendant had an oral agreement for a 15-year lease with plaintiff's predecessor, and that the plaintiff was equitably estopped from asserting the Statute of Frauds as a bar to the agreement. The relief sought by the plaintiff was therefore denied. The appellate court reversed and remanded the cause. (130 Ill. App. 3d 798.) We granted defendant's petition for leave to appeal.

The Chicago Regional Port District (the Port District) owns property located at the mouth of the Calumet

River known as the Iroquois Landing Lakefront Terminus (Iroquois Landing). In 1982, plaintiff's predecessor, International Great Lakes Shipping Company (Great Lakes), occupied the western half of the property under a written license from the Port District. The license gave Great Lakes the exclusive right to use the property for marine terminal services, including the loading, unloading and warehousing of various cargoes. Ceres Terminals, Inc. (Ceres Terminals), plaintiff's parent company, operated the eastern half of Iroquois Landing. Defendant, Illinois Scrap Processing, Inc., operated a scrap-processing and storage facility immediately west and adjacent to plaintiff's premises.

Early in 1982, defendant's president, Seymour Pielet, began discussions with Great Lakes' general manager, Robert Palaima, regarding the possibility of using approximately seven acres of Great Lakes' Iroquois Landing property for his company's operation. An area of 6.7 acres on the western edge of Great Lakes' premises was agreed to, and a survey of the parcel was ordered. Pielet (defendant's president) eventually agreed that defendant would pay the Port District $29,000 per year for its use of the property and would pay Great Lakes $32,000 per year in rent and dock-license fees. Pielet suggested an initial term of five years, with two options of five years each. He testified that Palaima (Great Lakes' general manager) responded by suggesting a straight term of 15 years.

Following these preliminary negotiations, the matter was referred to the parties' attorneys. Palaima testified that he expected a written agreement to be executed by the end of July 1982 and that he did not consider the oral agreement binding. Pielet testified that he anticipated the execution of a written consent document, but that he had no feeling one way or the other as to whether one was needed to bind the parties. In late June

1982, defendant's attorney prepared a draft letter and suggested to Palaima (Great Lakes) that it be used to inform the Port District of Great Lakes' intent to lease the 6.7 acres to defendant. The letter referred to the oral agreement as a *"tentative* sub-lease." (Emphasis added.)

Palaima testified that while negotiations for a final written agreement continued, Pielet asked for permission to move scrap onto the premises because of an overflow problem at defendant's facility. After consulting with his superiors, Palaima informed Pielet that defendant could move onto the premises even though a final written agreement had not been executed. In a letter to Pielet dated June 30, 1982, Palaima stated:

"As per our recent discussions and as per agreement, the following will apply to the storage of your material on approximately six acres on the western end of our Iroquois Terminal.

Commencing July 1, 1982, we offer 30 days free storage. Thereafter the fee will be $2,666.67 per 30 day period or fraction thereof.

It is anticipated that prior to the end of July, the legal arrangements for your use of the above mentioned property will have been worked out among our Companies and the Chicago Regional Port District. *It is understood that those arrangements and agreements, when mutually approved, will take precedence over this one."* (Emphasis added.)

Pielet (defendant's president) testified that the terms of the oral-lease agreement and this arrangement, under which defendant entered the property, were to be one and the same. He further stated that Palaima's (Great Lakes') letter accurately reflected the parties' oral-lease agreement. Pielet explained that Palaima limited the terms of his letter to the storage of scrap in order to prevent the Port District from asking for a greater share of the agreed rental payments and that Palaima

was aware that defendant would do more than store scrap on the premises. He noted that defendant conducted a full scrap-processing operation on the premises from the date of entry and Great Lakes did not object. Pielet also testified that he and Palaima never discussed whether a written document was to take precedence over their oral agreement.

Defendant moved onto the premises in late June or early July 1982, and began paying Great Lakes' monthly invoices for rent in August of that year. Pielet (defendant's president) testified that all the essential terms for a binding agreement, including the time period, had been reached before defendant moved onto the property. However, in July 1982, defendant's attorney informed Great Lakes' counsel that the agreement was not yet binding. He also indicated that he would not let defendant sign the agreement until certain specific questions were resolved.

On August 6, 1982, representatives of both Great Lakes and defendant sought the Port District's approval of the lease proposal. At some point after this date, it was determined that defendant's use of the Iroquois Landing property would be under a license from the Port District, which would be consented to by Great Lakes. The license from the Port District to defendant was reduced to writing and executed by both the Port District and defendant. A proposed consent to the license was prepared but was never executed by Great Lakes. After the August 6, 1982, meeting, the negotiations appear to be in terms of a license from the Port District and consent by Great Lakes, rather than a lease from Great Lakes.

Around September 1982, defendant asked for and received permission from Great Lakes to install a 70-ton scrap press on the premises. A 30-foot-long, 6-foot-deep concrete foundation was constructed for the press on the

property. After the foundation was completed, the press was assembled and welded to steel beams implanted in the concrete. Great Lakes' personnel and equipment assisted in both the construction of the foundation and the installation of the press. Defendant was charged separately for these services.

In February of 1983, the Port District and defendant signed a license agreement for the use of the 6.7 acres. Since Great Lakes had previously been granted the exclusive use of the property, defendant's license was made subject to Great Lakes' consent. However, as noted above, this license consent was never finalized and executed. Pielet (defendant's president) testified that as a result, a fence on the property, which defendant had agreed to build and which was required to be built by the license, was never completed.

In late April of 1983, Ceres Terminals purchased all of the stock of Great Lakes and changed the company's name to Ceres Illinois, Inc., plaintiff in this action. After the purchase, plaintiff sent defendant monthly invoices for the use of the 6.7 acres for May and June 1983. In July of that year, plaintiff informed defendant that its use of the property was inconsistent with and detrimental to plaintiff's operation. Plaintiff wrote two letters requesting that defendant discontinue its activities and remove all scrap from the Iroquois Landing property. When defendant failed to comply, plaintiff initiated this action.

The circuit court of Cook County found that all of the essential terms for a valid contract were present in the parties' oral agreement. The court also concluded that the parties' conduct demonstrated that they had contemplated a long term contract. Finally, the court held it would be unjust to allow plaintiff to assert the Statute of Frauds (Ill. Rev. Stat. 1983, ch. 59, par. 1 *et seq.*) as a bar to the oral contract. The court denied plaintiff the

relief it sought, and plaintiff appealed.

As previously noted, the appellate court reversed the judgment of the circuit court and remanded the cause for further proceedings. The court held that the trial court's finding that a valid 15-year oral agreement existed between plaintiff's predecessor and defendant was contrary to the manifest weight of the evidence. The court found that since a 15-year agreement did not exist, defendant moved onto the premises under the terms of the agreement referred to in Palaima's letter of June 30, 1982, which was terminable at will.

The appellate court further noted that even if a 15-year agreement existed between the parties, it was unenforceable under the Statute of Frauds (Ill. Rev. Stat. 1983, ch. 59, par. 1 *et seq.*). The court also found that there was no basis for the trial court's conclusion that plaintiff was estopped from asserting the Statute of Frauds as a bar to the oral agreement, and that any action defendant had taken in regard to the premises was at its own risk.

Defendant maintains that the trial court implicitly determined that the parties did not intend that the execution of a written license consent be a condition precedent to the existence of a 15-year contractual relationship between them. Defendant contends that in reversing the judgment below, the appellate court applied an incorrect standard of review to this implicit determination. Defendant also argues that the evidence presented in this cause, when assessed under the proper standard, amply supports the trial court's finding.

Ordinarily, the intent of the parties to an oral contract is a question to be determined by the trier of fact. (*Yorke v. B. F. Goodrich Co.* (1985), 130 Ill. App. 3d 220, 222-23.) A reviewing court must not set aside such a finding unless it is contrary to the manifest weight of the evidence. (*John J. Calnan Co. v. Talsma Builders,*

*Inc.* (1977), 67 Ill. 2d 213, 218.) In other words, after viewing the evidence in the aspect most favorable to the prevailing party below (*Sorenson v. Fio Rito* (1980), 90 Ill. App. 3d 368, 370), it must appear that conclusions opposite to those reached by the trier of fact are clearly evident (*Johnson v. Colley* (1986), 111 Ill. 2d 468, 474; *National Boulevard Bank v. Georgetown Life Insurance Co.* (1984), 129 Ill. App. 3d 73, 79). "[I]t is not enough to show that there is sufficient evidence to support a contrary judgment." (*People ex rel. Lauth v. Wilmington Coal Co.* (1949), 402 Ill. 161, 167.) However, the intent of the parties to an oral agreement may become a question of law "if the facts are undisputed and there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them." *Yorke v. B. F. Goodrich Co.* (1985), 130 Ill. App. 3d 220, 223; see also *Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 744-45.

We do not agree that the appellate court applied an improper standard of review in this action. While it noted that the parties' intent could be determined as a matter of law under proper circumstances, it is evident that the court reviewed the matter as a question of fact and applied the manifest-weight-of-the-evidence standard. The court reexamined the relevant evidence and found it "clear that the parties *** intended that the license agreement be reduced to writing and executed before entering a 15-year contractual relationship." (130 Ill. App. 3d 798, 803.) The court expressly stated that "[t]he evidence *clearly* supported plaintiff's contention that as a matter of law there was not a 15-year license agreement between the parties." (Emphasis added.) (130 Ill. App. 3d 798, 804.) The trial court held that a long-term contract was contemplated by the parties and that the facts of the negotiation indicated that it would be for a period of 15 years. However, the trial court also

stated: "There is no disagreement that both sides contemplated that the agreement would be reduced to writing and signed by both parties." The appellate court held that the trial court's finding that there was an oral 15-year agreement was contrary to the manifest weight of the evidence. The appellate court then stated the gist of its holding as follows: "It is well established that where the reduction of an agreement to writing and its formal execution is intended by the parties as a condition precedent to its completion, there can be no contract until then, even if the actual terms have been agreed upon." (130 Ill. App. 3d 798, 803.) In reviewing the evidence, the appellate court therefore applied the proper standard. But the basis of its holding was, in reality, bottomed on the trial court's finding that both sides contemplated that the agreement would be reduced to writing and signed by both parties. The ultimate holding of the appellate court was that the trial court had misapplied the law applicable where both parties intended that the agreement be reduced to writing and signed.

It is true that where the parties have assented to all the terms of the oral agreement the mere reference to a future written document does not negate the existence of a present contract (*Frank Horton & Co. v. Cook Electric Co.* (7th Cir. 1966), 356 F.2d 485; *Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 742) or end the inquiry into the intent of the parties (*Barton Chemical Corp. v. Pennwalt Corp.* (1979), 79 Ill. App. 3d 829, 834). For example, if the parties agree that a formal document will be prepared only as a memorialization of the oral agreement, the bargain is binding even though the document has not been executed. (*Luria Brothers & Co. v. Pielet Brothers Scrap Iron & Metal, Inc.* (7th Cir. 1979), 600 F.2d 103, 108; *Barton Chemical Corp. v. Pennwalt Corp.* (1979), 79 Ill. App. 3d 829, 834.) However, even where the es-

sential terms have been agreed upon, "if the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery. [Citations.]" *Chicago Title & Trust Co. v. Ceco Corp.* (1980), 92 Ill. App. 3d 58, 69; see also *People v. Chicago Metro Car Rentals, Inc.* (1979), 72 Ill. App. 3d 626, 629; *Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390, 395; *W. T. Grant Co. v. Jaeger* (1922), 224 Ill. App. 538, 546.

The appellate court noted that the inquiry into whether the parties to an agreement intended that it be reduced to writing may include consideration of the following factors: whether the contract is one usually put into writing; whether there are a few or a great many details; whether the amount of money involved is large or small; whether the agreement requires a formal writing for the full expression of the covenants; and whether the negotiations themselves indicated that a written document was contemplated as their conclusion. These are circumstances which the court in *W. T. Grant Co. v. Jaeger* (1922), 224 Ill. App. 538, 546, stated as having been suggested as being helpful in determining the intention of the parties in such cases. Also, where the anticipated document is never executed, the parties' conduct and statements subsequent to the oral agreement may be decisive of the question whether a contract had been made. *Knightsbridge Realty Partners, LTD-75 v. Pace* (1981), 101 Ill. App. 3d 49, 52.

We agree with the appellate court that these factors clearly indicate that the parties did not intend to be bound in a 15-year contractual relationship until their license-consent agreement was reduced to writing and executed. An agreement for the lease of real property for a period greater than one year is usually reduced to written form. Indeed, such an agreement is ordinarily

unenforceable if not set forth in writing. (Ill. Rev. Stat. 1983, ch. 59, par. 1; see *Winn v. Turner* (1977), 55 Ill. App. 3d 291, 293.) In addition, the final version of this license consent was not a simple memorialization of the parties' oral agreement; it contained a fair number of provisions regarding details which Pielet (defendant's president) and Palaima (Great Lakes) had not previously discussed or agreed upon. These provisions concerned assignability, sublicensing, physical changes to the property, indemnity, liens, and access to the property—provisions necessary to the full expression of the parties' covenants. The amount involved in the agreement was substantial: $32,000 per year for 15 years, or $480,000, would have been paid as a result of its completion.

The parties' negotiations themselves indicated that a written document was to be the conclusion of the process. After their initial meetings, both Pielet and Palaima entrusted the negotiations to their attorneys. While Pielet said he had no feeling one way or the other as to whether a written agreement was needed to bind the parties, he did anticipate that one would be completed. While working on the formal document, defendant's attorney indicated that the oral agreement was only tentative and not binding on the defendant.

In Illinois for a lease contract to be valid, there must be agreement as to the extent and bounds of the property, the rental price and time and manner of payment, and the term of the lease. (*Bournique v. Williams* (1922), 225 Ill. App. 12, 20-21.) According to Pielet's (defendant's president's) testimony these essential terms had been established before June of 1982. Yet, after Pielet and Palaima completed their negotiations, defendant did not immediately move onto the property. Instead, while the parties' attorneys were working on the written agreement, defendant requested Great Lakes' permission to occupy the premises. If the parties had intended their

basic oral agreement to be a binding lease there would have been no need for defendant's request.

Neither Palaima's (Great Lakes') letter of June 30, 1982, nor defendant's move onto the Iroquois Landing facility evidenced a change in the parties' intent. Palaima's letter expressly stated his position that a written agreement, when mutually approved, would take precedence over any other agreements between the parties. While Pielet (defendant's president) testified that he did not discuss this issue with Palaima, he did state that the terms of the license consent and this arrangement were one and the same. Further, defendant moved onto the property without objecting to this language.

We cannot agree with defendant's contention that the parties' conduct and statements subsequent to the move indicated that they intended to be bound for 15 years by their oral agreement. After the move onto Great Lakes' property, defendant's attorney indicated that the proposed agreement was not binding and that he would not let his client sign the agreement until all the terms were finalized. Also, as part of the oral agreement reached with Palaima, Pielet agreed that defendant would construct a fence around the 6.7-acre parcel. Pielet testified that this fence was never constructed because defendant "didn't want to put no fence up until we got all the agreements." Clearly this conduct indicated that defendant did not consider itself bound by the oral agreement.

Defendant places great emphasis on what it refers to as the parties' actual performance of the oral contract. Specifically, defendant contends that its payment of rent, the extent of its operation on the premises, and the installation of its 70-ton press demonstrate that the parties had entered a binding 15-year oral agreement.

We find that this conduct did not negate the expressions of intent found in the parties' prior actions and Palaima's letter of June 30, 1982. In fact, the payment of

rent under the temporary arrangement was monthly, whereas in the tendered consent to license the annual rental was to be paid in two equal installments. Plaintiff's acquiescence to defendant's operation of a full-scale scrap-processing facility was consistent with the parties' oral license agreement. However, defendant's payment of rent was totally consistent with the terms expressed in the letter. Also, the payments represented rent only; no dock-license fee was charged during this period.

Defendant requested Great Lakes' permission to install the scrap press after it entered the property. If a lease contract had existed between the parties based upon their agreement to the essential terms noted above, there would have been no need for defendant to seek permission for such an action. (49 Am. Jur. 2d *Landlord and Tenant* sec. 226 (1970).) While the installation of the scrap press did indicate that both parties expected defendant to occupy the premises for a substantial period of time, even viewed in the aspect most favorable to defendant, there is nothing in plaintiff's actions to indicate that either party expressly intended to be bound for a 15-year period. There is also no express indication that Great Lakes' intent, as set forth in Palaima's letter, had changed.

Having determined that a 15-year contractual relationship did not exist between these parties, we agree with the appellate court's finding that defendant's occupancy of the premises was under an indefinite-term oral agreement outlined in Palaima's letter of June 30, 1982. (130 Ill. App. 3d 798, 804.) Therefore, plaintiff acted within its contractual rights in terminating the oral agreement. See *Gage v. Village of Wilmette* (1924), 315 Ill. 328, 331; *Garber v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 675, 682.

Even if we accept defendant's assessment of the evidence, we find that the plaintiff was not estopped from

asserting the Statute of Frauds (Ill. Rev. Stat. 1983, ch. 59, par. 1 *et seq.*) as a bar to the alleged 15-year oral agreement. To invoke the doctrine of estoppel the representation or conduct need not be "fraudulent in the strict legal sense or done with an intent to mislead or deceive." (*Beynon Building Corp. v. National Guardian Life Insurance Co.* (1983), 118 Ill. App. 3d 754, 763.) Rather, the test is "whether in all the circumstances of the case conscience and [the] duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct." (118 Ill. App. 3d 754, 763.) In the absence of such conduct the party changing his position must be said to have acted solely upon his own judgment and at his own risk. *Ozier v. Haines* (1952), 411 Ill. 160, 165.

Defendant argued, and the trial court apparently agreed, that the determinative factor giving rise to an estoppel in this action was plaintiff's and Great Lakes' active participation in the complete establishment of its scrap-processing operation on the premises. Defendant maintained that it relied on this participation in the reasonable belief that a valid oral contract existed between the two parties. However, the appellate court found that there was no basis for the trial court's implicit determination that plaintiff engaged in conduct amounting to fraud or misrepresentation. (130 Ill. App. 3d 798, 805.) We agree.

Both plaintiff and defendant were represented by counsel during negotiations; therefore, both are deemed to have known that their oral agreement was unenforceable. In addition, there was no evidence presented that either party possessed knowledge regarding this transaction that the other did not. Therefore, defendant's actions were taken at its own risk unless induced by plaintiff's fraud or misrepresentations.

Plaintiff's actions did not amount to such conduct.

Plaintiff allowed defendant the opportunity to make use of the property while a final written contract was being prepared. Both parties knew that the arrangements for this use were temporary and that the terms of the long-term letting would be governed by the written document. Defendant, on its own initiative, requested permission to install the scrap press, and plaintiff merely allowed it to proceed. Plaintiff's equipment and employees were used in the installation of the press, but this assistance was provided under a separate agreement with defendant. Lastly, plaintiff simply allowed defendant to establish a full-scale scrap-processing operation on the premises. Such actions cannot be said to amount to misrepresentations of plaintiff's position or concealment of any material facts. At no time did plaintiff cease negotiations for a final written agreement or conceal its position on the oral agreement. Thus, defendant's decisions to install the press and conduct a full-scale scrap-processing operation were made on its own judgment and at its own risk.

The cases cited by defendant which deal with the Statute of Frauds do not require a different result. In *Rosenstein v. IDA Products Co.* (N.D. Ill. 1973), 362 F. Supp. 642, plaintiff and defendant entered into an oral distributorship agreement. Plaintiff, pursuant to the agreement and with defendant's approval, obtained warehouse facilities. (362 F. Supp. 642, 644.) The district court did note that a party could be estopped from using the Statute of Frauds to work an injustice. (362 F. Supp. 642, 645.) However, the court refused to apply the doctrine because the plaintiff had not alleged any conduct by the defendant which amounted to fraud or material misrepresentation. 362 F. Supp. 642, 646.

In two other cases cited by defendant, *National Importing & Trading Co. v. E. A. Bear & Co.* (1927), 324 Ill. 346, 358, and *Grundy County National Bank v.*

*Westfall* (1973), 13 Ill. App. 3d 839, 845, it was noted that Illinois courts will not allow the Statute of Frauds to be used to accomplish a fraud. In *National Importing* the oral change in a written contract was induced by the party who sought to raise the defense of the Statute of Frauds to the oral charge. (324 Ill. 346, 349-52.) The court simply applied the principle of estoppel. (324 Ill. 346, 357-58.) This case is factually dissimilar to ours. In *Grundy County National Bank* the court decided the case on the basis of the doctrine of part performance (13 Ill. App. 3d 839, 844-45), which has not been urged by defendant in this action.

For the reasons stated above, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

CHIEF JUSTICE CLARK took no part in the consideration or decision of this case.