980 F.2d 449
 RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER, Plaintiff-Appellee,
and
Chicago Regional Organ and Tissue Bank, Frederick K. Merkel,
and June D. Bajor, Involuntary-Plaintiffs-Appellees,
and
South Chicago Community Hospital, Intervening-Plaintiff-Appellee,
v.
HELLENIC REPUBLIC, Hellenic Republic National Agricultural
Insurance Institute, and Social Insurance
Institute of Greece, Defendants-Appellants.
 No. 92-1396.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 20, 1992.
Decided Nov. 23, 1992.
Rehearing and Rehearing En Banc
Denied Feb. 16, 1993.
 
 Diane I. Jennings, Catalina J. Sugayan (argued), Floyd A. Wisner, Sandra K. Macauley, Lord, Bissell & Brook, Chicago, Ill., for Rush-Presbyterian-St. Luke's Medical Center.
 William J. Harte, Mary E. Rosen, Erik D. Gruber (argued), Chicago, Ill., for Chicago Regional Organ and Tissue Bank, Frederick K. Merkel, June D. Bajor.
 George C. Pontikes (argued), Theodore Rodes, Jr., Pontikes & Associates, Chicago, Ill., for Hellenic Republic, Hellenic Republic Nat. Agricultural Ins. Institute, Social Ins. Institute of Greece.
 William J. Harte, Mary E. Rosen, Cynthia Photos Abbott (argued), Peter Petrakis, Katten, Muchin & Zavis, Chicago, Ill., for South Chicago Community Hosp.
 Before BAUER, Chief Judge, POSNER, Circuit Judge, and ESCHBACH, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 Two Chicago hospitals brought this suit against the government of Greece and two of its agencies, seeking payment of unpaid bills in excess of $500,000 for hospital services provided in connection with kidney transplants. After we held that the suit was not barred by sovereign immunity, 877 F.2d 574 (7th Cir.1989), the district court granted summary judgment for the plaintiffs, ordering the defendants to pay the plaintiffs' unpaid bills in full. The defendants argue that the contract for the transplants placed a ceiling on the hospitals' charges which the bills exceeded, and alternatively that one of the hospitals is barred from collecting any part of its bills because it lacked a certificate of need to perform kidney transplants.
 
 
 2
 The Greek government guarantees the provision of health care to its citizens. In the early 1980s, Greece ran short of kidneys for transplantation. Dr. Frederick Merkel, an American surgeon of Greek origin who is the president of the Chicago Regional Organ and Tissue Bank and has privileges at Rush-Presbyterian-St. Luke's Medical Center and South Chicago Community Hospital, entered into negotiations with the Greek ministry of health to create a program for performing the necessary transplants in Chicago. The organ bank would maintain a list of Greek citizens who needed kidney transplants, and as suitable kidneys became available the persons on the list would be flown to Chicago where Dr. Merkel would perform the operation. It had to be performed in a hospital and Merkel wanted to use Rush-Presbyterian, which agreed on condition that he produce a letter from a responsible Greek agency guaranteeing payment of Rush-Presbyterian's hospital bill. Before the conclusion of the negotiations, Merkel performed a transplant operation on a Greek citizen at Rush-Presbyterian after Rush received a letter of guarantee. The organ bank billed the Greek government $62,000 for the total costs of the operation, of which $52,000 represented hospital costs. Two other transplants were performed before a final contract was signed.
 
 
 3
 On May 26, 1983, negotiations for the transplant program having been essentially completed, Merkel while on a trip to Athens wrote a letter on behalf of his organ bank to the Greek minister of health and welfare, setting forth the details of the program. The first two pages of this three-page letter detail the medical services to be rendered by Merkel and his organ bank. The only reference to costs in these two pages relates to procuring the kidney for transplantation. That cost, it is explained, "is estimated at $10,000 to $11,000. However, because this is a new program, these costs are not secure." The third page of the letter is captioned "Costs of the Programme" and explains that these "include estimates of the per diem [hospital] cost, laboratory testing, X-rays, physician fees, and additional services such as intensive care, pulmonary and physical therapy." A list of costs follows, prefaced by the statement: "These are estimated on the basis of current 1982-83 costs." We quote the list:
 
 
 4
 Pretransplant dialysis (1 wk) $ 600.00
Pretransplant lab testing 100.00
Pretransplant crossmatch 250.00
Cadaver kidney costs 10,050.00
Administrative costs 5,000.00
Transplant procedure (15 days) 19,000.00
 ----------
 $35,000.00
 
 
 5
 The sentence that follows the list reads: "Obviously, complications resulting in additional hospitalizations and/or surgery will require additional funds."
 
 
 6
 The ministry responded in a letter dated June 24 which purported to accept Merkel's letter offer except for a trivial matter relating to the preparation of the patients. However, the ministry's letter also includes a proposal with regard to payment--that $20,000 will be deposited "when the candidate arrives at the above center" (apparently a reference to the organ bank) and "the bill must be paid at the time of the patient's departure from Chicago."
 
 
 7
 In December 1983, Merkel on behalf of the organ bank, and a representative of the Greek consulate in Chicago, signed a document entitled "International Kidney Transplant Programme." It is a verbatim copy of Merkel's May 26 letter except for the final paragraph, which concerns the mechanics of payment, and which provides for the deposit of $20,000 in the organ bank's bank account upon the patient's arrival in Chicago and for the deposit of an additional $15,000 in that account "when the patient is discharged from the hospital in Chicago. If there are additional bills outstanding relating to the transplant surgery, those bills will be submitted to the Greek Consulate in Chicago for payment by the Greek Government within two (2) months of the date received." The contract contains no term, so was terminable by either party at will. Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc., 130 Ill.App.3d 798, 804, 86 Ill.Dec. 48, 52, 474 N.E.2d 1245, 1249 (1984), aff'd, 114 Ill.2d 133, 102 Ill.Dec. 379, 500 N.E.2d 1 (1986); First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1012 (7th Cir.1985).
 
 
 8
 After the contract was signed, Rush continued to require a letter of guarantee before it would authorize Dr. Merkel to perform a kidney transplant at Rush on a Greek citizen. These letters were furnished by the two agencies of the Greek government--codefendants in this suit along with the government itself--that administer Greece's social insurance programs. Addressed to Dr. Merkel's organ bank, a typical letter of guarantee "assure[s] you that from now on, we undertake all the expenses of hospitalization on account of [name of patient] for as long as medically is necessary and in a multi-bed room, provided that this is medically permitted."
 
 
 9
 During 1983 and 1984, Dr. Merkel performed seven transplant operations on five Greek citizens. Rush billed him for its hospital services to these patients, and Merkel forwarded Rush's bill together with his own bill and that of other providers of services connected with the transplants to the defendants for payment. Rush's average bill was far higher than the $19,000 estimated for hospital services in the contract (the row headed "transplant procedure (15 days)" was intended to cover the hospital's bill)--in fact three times higher. The defendants paid only a small fraction of the total bill, so Rush refused to permit Dr. Merkel to perform any more operations under the transplant program. He then turned to the South Chicago Community Hospital, where he also had surgical privileges, and which allowed him during 1984 to perform seven transplants (for six patients) under the program. Out of a total bill of $237,000 submitted by South Chicago through Merkel, the defendants paid only $35,000. This suit followed. Although the judge ordered Merkel, his organ bank, and one of his associates at the organ bank joined as involuntary plaintiffs pursuant to Fed.R.Civ.P. 19(a), because the hospitals' bills had been forwarded through the organ bank and the defendants were arguing that Merkel had retained money due the hospitals, no relief was sought by or against these additional plaintiffs and the final judgment in favor of the hospitals recites that it decides all claims between all plaintiffs and all defendants. It is therefore a final, appealable decision within the meaning of 28 U.S.C. § 1291.
 
 
 10
 We do not know why the hospitals are the only claimants. But perhaps Merkel, the organ bank, and the other providers of services connected with the transplants were paid in full. The defendants argued that he was overpaid--that he held back from the hospitals money the defendants had earmarked for them--but the judge found, we think correctly, that the defendants had failed to present any evidence of this. All they submitted was a letter from the Greek consulate, prepared during the course of this litigation, stating that the defendants had paid the organ bank more than the hospitals claim is owed them. The letter is not admissible in evidence and, if it were, would have no probative significance. The organ bank was the billing agent for all providers of services in connection with the transplants, including itself, and not just for the hospitals; and there is no indication that any of the money which the consulate letter says the organ bank received was on account of the hospitals. We add that as undisclosed principals the hospitals are entitled to sue the defendants directly under the contract and the guarantees rather than having to go against Merkel, O'Connor v. Village of Palos Park, 31 Ill.App.3d 528, 534, 333 N.E.2d 276, 281 (1975); American National Bank & Trust Co. v. Weyerhaeuser Co., 692 F.2d 455, 462 (7th Cir.1982), and that there can be no doubt that the contract left to Merkel the choice of which hospital or hospitals at which to perform the operations.
 
 
 11
 The principal issue is whether the $19,000 "estimated" cost of hospitalization per transplant was a ceiling, save as Merkel or the hospitals could show that the operation had involved "complications." The hospitals seek to bypass this issue by claiming under the guarantees as well as under the contract; the guarantees contain no limit. But either the guarantees are of the Greek government's performance under the contract, and therefore are subject to any payment ceiling in the contract, or they are separate contracts and therefore require consideration. Continental National Bank v. Schiller, 89 Ill.App.3d 216, 44 Ill.Dec. 471, 411 N.E.2d 593 (1980). The latter possibility requires us to distinguish between guarantees issued before and after the contract was signed. The prior guarantees were demanded by Rush, and its agreement to allow Dr. Merkel to perform the kidney transplants was the consideration for the guarantees. Not only do these (like the later) guarantees contain no price limit; there was no contract in existence from which such a limitation might be inferred. These guarantees were a promise to Merkel, and hence to his undisclosed principal, Rush, to pay the hospital costs incurred by the transplant patients. The promise was supported by consideration, and was therefore enforceable. We do not agree with the hospitals' lawyer, however, that it was an enforceable promise to pay those costs whatever they might be. When one hires a provider of professional services, such as a hospital, by a contract that does not contain a price term, it is implicit that the price charged under the contract will not exceed a reasonable price for the services in question. Victory Memorial Hospital v. Rice, 143 Ill.App.3d 621, 97 Ill.Dec. 635, 493 N.E.2d 117 (1986); Ingrassia v. Ingrassia, 156 Ill.App.3d 483, 494, 109 Ill.Dec. 68, 76, 509 N.E.2d 729, 737 (1987). The defendants continue to complain that the hospitals have never explained why their charges were so far in excess of the cost estimated in the contract. But in the district court they waived any argument that any of these charges were unreasonable. They staked their all on the argument that the charges exceeded a ceiling set forth in their contract with the plaintiffs, even though this argument could have no force at all with regard to the transplants performed before the contract was signed.
 
 
 12
 The guarantees issued after the contract was signed have no significance save as evidence bearing on what the contract probably meant. If in fact the parties agreed to a price ceiling, it would make no sense to suppose that one of them then demanded guarantees without the ceiling and the other acceded to the demand--if so, it would be a modification of the contract, and modification is not argued. Nor has consideration for the modification been shown, Chicago College of Osteopathic Medicine v. George A. Fuller Co., 776 F.2d 198, 208-09 (7th Cir.1985); United States v. Stump Home Specialties Mfg., Inc., 905 F.2d 1117, 1121 (7th Cir.1990), or been argued to be unnecessary. Id. at 1121-22.
 
 
 13
 So we must interpret the contract. We agree with the district judge that the reference to an estimated cost of $19,000 per hospitalization was not intended to limit what the hospitals could charge. In ordinary parlance an estimate is an approximation, a best guess, a forecast, an informed guess, a judgment--but not a commitment to an exact figure. In the construction industry and perhaps in some other industries as well, the term has acquired the special meaning of an exact price. City of Chicago v. McKechney, 205 Ill. 372, 457-59, 68 N.E. 954, 984 (1903). But the defendants do not contend that the hospital industry is one of these industries. Indeed, they do not claim that $19,000 is a fixed ceiling on payment for the hospital services required for the transplantations. They consider it a floating ceiling--a ballpark figure. This is an unsatisfactory position because it would make it impossible in any case involving a contract that contained an estimated figure to know what the paying party owed the performing party.
 
 
 14
 There are other reasons for doubting that the "estimated" costs are a ceiling. One is the negotiating history. The estimates first appeared in Dr. Merkel's proposal to the Greek government, and it is natural that a proposal would contain an estimate, to assist the recipient of the proposal in evaluating it. The estimates are repeated verbatim in the contract. The contract has no fixed duration, but is terminable at will, so that if the Greek government didn't like the bills it was receiving it could cancel the contract at any time. Before the contract was signed, the Greek government had already been billed $52,000--not $19,000--for the hospital costs incurred by the first transplant patient, so it must have known that the $19,000 estimate was a crude one. It is most unlikely, to say the least, that Rush would have authorized, or that the defendants would have thought it would have authorized, Dr. Merkle to negotiate a ceiling on its bills. A related difficulty with treating an estimate as a ceiling is that if it is not also a floor, which no one suggests, it will result in systematic undercompensation. Suppose $19,000 was the estimated average expense of hospital services incident to a kidney transplant (and hence a good estimate ) but it was understood that the actual expense would be either higher or lower. Suppose it was $9,000 on one occasion and $29,000 on another. The average would be $19,000, but if the hospital were forbidden to charge more than the actual or the estimated expense, whichever was less, it could collect only $28,000 for services that had cost it $38,000 to provide.
 
 
 15
 The lack of any price limitation in the guarantees is further evidence that the defendants believed they were guaranteeing the full expenses of the operations, as is the reference to "additional bills," above $35,000, in the last sentence of the contract. Furthermore, in a period of rapid inflation in medical costs, as the early 1980s were, a provider of medical services who agreed to a price ceiling would, if rational, also insist on some sort of escalator provision--unless he were desperate for the business, but there is no evidence of that here.
 
 
 16
 It is true that insurers frequently insist that providers of insured medical services accept a limitation on the amount of the providers' bill that the insurer will reimburse. But the insurers do this explicitly. And when they do, the doctor or other provider of health care can still bill the patient for the difference between his cost and the amount that is reimbursable. No one suggests that Dr. Merkel was authorized to charge the Greek citizens that he operated on under the transplant program.
 
 
 17
 The contract does refer to additional charges for "complications," and the defendants argue that this is an escape hatch from the price ceiling that the hospitals have failed to take advantage of. But the term is not defined. It could easily be thought that any operation of more than average cost involves, by definition, "complications" to the extent that it exceeds the average.
 
 
 18
 In explaining why we think that $19,000 was not intended to be a ceiling on the hospitals' bills, we have gone beyond the semantics of "estimated" to consider other provisions in the contract, its history, associated documents, and the common sense of the situation. If we must go this far, does this show that the meaning of the contract presents a genuine issue of material fact, requiring a trial? We think not. The defendants have listed in their main brief the issues of fact that in their view precluded summary judgment. None of them concerns the meaning of "estimated." They have to do with the guarantees, with alleged misrepresentations that Dr. Merkel made to the hospitals, and with Merkel's alleged holding back of moneys received from the defendants for the hospitals. Apparently all the evidence bearing on the meaning of "estimated" is uncontested, making summary judgment on the issue proper.
 
 
 19
 We turn to the second issue. Illinois law, purportedly in order to head off unnecessary construction or modification of health care facilities, provides that no one may construct, modify, or establish a health care facility without a permit, called a "certificate of need," from a state board. Ill.Rev.Stat. ch. 111 1/2, p 1155. The establishment of a renal transplant center at South Chicago Community Hospital is conceded to be an action requiring a permit under this statute, but the hospital has never obtained one--indeed has been turned down for one, on the ground that Chicago does not need another renal transplant center. The defendants argue that the failure to obtain the permit bars South Chicago from collecting anything for the hospital services that it rendered under the transplant program.
 
 
 20
 The district judge rejected this argument on the ground that the certificate of need statute provides its own means of enforcement--a $10,000 fine that can be imposed only in an action by the state. Ill.Rev.Stat. ch. 111 1/2, p 1164. (No such action has been brought against South Chicago--and it is eight years since it violated the statute.) As the defendants point out, this reasoning overlooks the fact that illegality can be a defense to a contract, American Buyers Club v. Grayling, 53 Ill.App.3d 611, 613, 11 Ill.Dec. 449, 451, 368 N.E.2d 1057, 1059 (1977); E & B Marketing Enterprises, Inc. v. Ryan, 209 Ill.App.3d 626, 154 Ill.Dec. 339, 568 N.E.2d 339 (1991), even though statutes that make conduct illegal ordinarily prescribe public remedies against it. In particular, a number of cases in Illinois and other states forbid an unlicensed doctor or lawyer--or for that matter architect, plumber, or funeral director--to collect his fee, even if he rendered his services with all the skill of a licensed practitioner. E.g., Tedrick v. Hiner, 61 Ill. 189 (1871); Tovar v. Paxton Community Memorial Hospital, 29 Ill.App.3d 218, 330 N.E.2d 247 (1975). South Chicago Community Hospital is a licensed hospital, and there is no suggestion that it lacks the competence to provide hospital services to transplant patients. But it was not authorized to provide those services, because it had no permit to operate a renal transplant center and could not get one because the pertinent state agency believes that Chicago has enough such centers already.
 
 
 21
 We do not think that a permit requirement designed to prevent the oversupply of competent services should be equated to a license requirement designed to protect people from incompetent practitioners. Of course it can be argued that both types of requirement are really just designed to restrict competition, but the courts that have refused to allow the unlicensed practitioner to collect his fee have done so not on the ground of restricting competition but out of fear of the harm to the public that such a practitioner might cause. This was true even in the case on which the defendants principally rely, Broverman v. City of Taylorville, 64 Ill.App.3d 522, 21 Ill.Dec. 264, 381 N.E.2d 373 (1978). The plaintiffs had a development permit, but not an operating permit, to haul waste. The statute made clear that to haul waste without an operating permit was forbidden. Among the objects of the statute was to prevent pollution; so it could be said that the statutory requirement was related to the public health. The same cannot be said here. The fell sanction of denying all compensation for valuable services skillfully rendered is apt only as a deterrent against a public menace thought to be posed by unlicensed activities, albeit not a menace actualized in every case. The performance of renal transplants at South Chicago Community Hospital poses no menace, let alone a severe one, to the public; at worst is may result in a slight increase in the cost of hospital services in the Chicago area.
 
 
 22
 Proportionality is the cornerstone of a rational system of sanctions. Newman v. Metropolitan Pier & Exposition Authority, 962 F.2d 589, 591 (7th Cir.1992). A forfeiture of $200,000 is an excessive punishment for an offense punishable by a fine of only $10,000 and so lightly regarded by the state that it has not sought to impose the fine even though it learned of the violation years ago. This case is within the gravitational field not of Broverman but of Amoco Oil Co. v. Toppert, 56 Ill.App.3d 595, 598-99, 14 Ill.Dec. 241, 243-44, 371 N.E.2d 1294, 1296-97 (1978), where the Illinois Appellate Court held that a statutory violation that was not "a serious affront to public policy or ... seriously injurious to the public welfare" would not justify a refusal to enforce a contract. See also Northern Indiana Public Service Co. v. Carbon County Coal Co., 799 F.2d 265, 273-74 (7th Cir.1986); 2 E. Allan Farnsworth, Farnsworth on Contracts § 5.6, at p. 64 (1990).
 
 
 23
 AFFIRMED.
 
 
 24
 BAUER, Chief Judge, dissenting.
 
 
 25
 I begin the dissent by agreeing with virtually everything contained in the majority opinion; the suit is based on the contract and the plaintiffs, as undisclosed principals, have standing to sue. Moreover, the $19,000.00 estimate is just that: an estimate and not a ceiling (nor should it be a subbasement). But the fact remains that the plaintiffs are entitled to a finding in their favor on liability.
 
 
 26
 Now to where I part company. When an "estimate" that provides the basis for a contract is exceeded by three hundred to seven hundred percent, I believe it incumbent of the estimator (in this case, the hospital plaintiffs speaking through their agent) to allege and prove the reasonable value of the services for which they seek compensation. And that was not done.
 
 
 27
 The defendants in this case were in a particularly disadvantageous position to evaluate the reasonable costs. Not only were they in a foreign country, they were separated by thousands of miles, a diversity of language and an incredibly different social and economic society. They had to rely on the good faith of the doctors, hospitals and other people involved. And their duty, it seems to me, is to provide proof of the reasonableness of their charges when those charges are obscenely out of line with the "estimate." And that proof must be more than the fact that the figure represents what the hospital billed. As near as I can tell from the pleadings below, the briefs in this court, and the oral argument by counsel for the plaintiffs, the figure must be reasonable because that's what the hospital billed.
 
 
 28
 Unlike the opinion of the majority, I believe the discrepancy between "estimate" and final billing was so wide as to exclude summary judgment. I would remand for trial on that issue.