No. 51,221

AUGUSTA MEDICAL COMPLEX, INC., *et al., Appellees,* v. BLUE CROSS OF KANSAS, INC., *Appellant.*

(608 P.2d 890)

Opinion filed March 18, 1980.

*Gerald L. Goodell,* of Goodell, Stratton, Edmonds, Palmer & Wright, of Topeka, argued the cause, and *Harold S. Youngentob,* of the same firm, was with him on the brief for the appellant.

*Robert J. Roth,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

FROMME, J.: This is an interlocutory appeal from an order of the trial court granting a temporary injunction against Blue Cross of Kansas, Inc. (Blue Cross), and in favor of Augusta Medical Complex, Inc., and twenty other hospitals (hospitals).

This action was commenced by appellees-hospitals against appellant-Blue Cross seeking a declaratory judgment as to the rights of the parties and specific performance of certain contracts. The hospitals sought a temporary injunction which was granted by the trial court. Blue Cross has taken this interlocutory appeal from the order granting the temporary injunction. The hospitals attempted to allege a cause of action for violation of antitrust laws but the order granting the temporary injunction did not involve those allegations and, hence, the antitrust allegations are not before the court in this appeal.

Blue Cross was organized as a private mutual nonprofit hospital service corporation, pursuant to K.S.A. 40-1801 *et seq.* Its primary purpose is to sell insurance to its subscribers covering hospital service costs. Blue Cross has entered into individual contracts with hospitals known as "member hospitals" whereby the hospitals provide hospital service to the Blue Cross subscribers, which services are covered by the subscriber's Blue Cross insurance policies. The contracts are as contemplated by K.S.A. 1979 Supp. 40-1803.

Whenever a subscriber receives hospital services in a member hospital, the services are covered to the extent of one hundred percent (100%) of the covered charges, less any deductible as provided in his or her policy. A subscriber may seek hospital services in a hospital that does not have a contract with Blue Cross (hereinafter referred to as "nonmember hospitals"), but in that event, the benefits or services are covered only to the extent of eighty percent (80%) of charges, less any deductible. The additional twenty percent (20%) must be borne by the subscribers personally.

The past contracts between Blue Cross and member hospitals have generally provided for a procedure for reimbursement for services rendered to subscribers based upon the cost of the

services provided by the hospitals. All of the appellees-hospitals are presently operating under such contracts which are referred to as retrospective reimbursement contracts. The contracts here involved were first executed in 1970. Pursuant to these contracts, the member hospitals are reimbursed directly by Blue Cross to the extent of one hundred four percent (104%) of allowable costs as determined by Blue Cross, which costs are established by considering the average costs over the preceding two-year period. The hospitals are generally reimbursed on an interim basis as the services are rendered and at the end of the year adjustments are made so as to effect the reimbursement of the hospitals to the extent of 104% of the allowable costs. If the hospitals have received excessive interim payments, reimbursements have to be made by the hospitals to Blue Cross.

The 1970 contracts here involved contain the following provisions:

"SECTION V. GENERAL CONDITIONS

. . . .

"2.   This agreement may be terminated by either party on prior written notice to the other, and in the event of such termination the obligations of both parties shall continue under this agreement until the expiration of a period of six months following the first of the month after notice of termination is given. This agreement will automatically be terminated at the time the Hospital changes ownership or leasing agreement for total operation.

"3.   This agreement may be modified or may be replaced with a new agreement when the modification or the new agreement is approved by at least 75% of the Member Hospitals in the Kansas Blue Cross service area representing at least 75% of the beds and approved by the Blue Cross Board of Directors."

In 1972, Blue Cross proposed a new type of contract which provided for a voluntary system of prospective reimbursement. This was an experiment and was not generally accepted. In 1975, Blue Cross offered another prospective reimbursement contract. This again received only limited acceptance. Finally in 1977, Blue Cross informed the hospitals that they were phasing out the 1970 agreement and would in the future offer only the mandatory prospective rate review agreement (the 1978 agreement). The changeover was to be effected by January 1, 1979, which deadline was subsequently extended to January 1, 1980. The member hospitals were all advised of this plan by letter dated December 30, 1977. This change in contract was urged upon Blue Cross by the Insurance Commissioner of Kansas, who exercises certain control over the premiums which can be charged by Blue Cross.

See *Blue Cross & Blue Shield v. Bell,* 227 Kan. 426, 607 P.2d 498 (1980).

Late in 1977, Blue Cross sent out the 1978 agreement to the hospitals and engaged in an extensive campaign to encourage voluntary execution of the replacement contracts. Blue Cross consistently indicated that it desired all of the hospitals to continue as member hospitals but to do so under the new mandatory prospective rate review agreement.

The campaign did result in the execution of the 1978 contracts by 107 of the 141 hospitals in the Blue Cross service area but these hospitals had only 68.2% of the beds. This was not sufficient to comply with Section V, paragraph 3, which authorizes unilateral modification or replacement of the 1970 agreement.

By letters dated November 20, 1978, Blue Cross gave official notice to the hospitals which had not executed a 1978 contract that Blue Cross was terminating their 1970 contract pursuant to Section V, paragraph 2 of the 1970 contract.

The notices of termination contained the following paragraph:

"The purpose of this letter is to provide official notice that Blue Cross will terminate the Contract at your hospital dated July 15, 1972, on May 31, 1979, which is the expiration of a period of six months following the first of the month after this notice of termination. This notice is given pursuant to Section V, paragraph 2 of the Agreement with your hospital. Between the date of this letter and May 31, 1979, the obligations of both parties shall continue pursuant to the terms of that agreement."

After the official notice of termination was mailed Blue Cross continued to ask the hospitals to sign the 1978 contracts. This was by correspondence and personal interview. It was not until March, 1979, that Augusta Medical Complex advised Blue Cross of its intention to become a nonmember hospital. It was then that Blue Cross notified the hospitals that because of the obligation it had to subscribers it must notify subscribers of the names of the nonmember hospitals so the subscribers could, with full knowledge of the hospital cost consequences, choose the hospitals from which they desired services. Prior to this time all 141 hospitals in Kansas were member hospitals. It was at this point the 21 hospitals filed the present action. After a three-day evidentiary hearing the hospitals obtained the temporary injunction now in question.

In granting the injunction which enjoined Blue Cross from terminating the 1970 contracts the court found that the contracts were valid, that Blue Cross had tried but had been unable to

comply with the provision in the contract for unilateral modification or replacement under Section V, paragraph 3, and that written notice of termination had been given to the hospitals in accordance with Section V, paragraph 2. The parties filed a written stipulation which supports these findings. However, the trial court, disregarding the effect of its own findings, determined that when Blue Cross started out to obtain modification or replacement of the 1970 contract and failed, it could not thereafter terminate the 1970 contracts under Section V, paragraph 2. We do not agree.

It is well established that a trial court is vested with a large measure of discretion in granting a temporary injunction, and that appellate courts will not interfere absent a manifest abuse of discretion. *Southeast Kansas Landowners Ass'n v. Kansas Turnpike Auth.,* 224 Kan. 357, 373, 582 P.2d 1123 (1978); *Smith v. City of Kansas City,* 167 Kan. 684, Syl. ¶ 5, 208 P.2d 233 (1949). In order to prevail on this appeal, Blue Cross has the burden of showing that the trial court clearly abused its discretion in granting the temporary injunction. In assessing whether the trial court clearly abused its discretion in granting the temporary injunction it must appear that the contract at issue was valid and binding on the parties, that appellant fully complied with the provision for termination contained therein, and that the right to terminate was a separate and distinct right. It is an abuse of discretion for a trial court to grant a temporary injunction requiring appellant to continue to carry out the terms of a contract when under agreed facts, as a matter of law, the appellant had the right to terminate the contract and did so.

Both parties now state that the two paragraphs are clear and unambiguous and that the other paragraphs of the contract need not be considered in determining the meaning and effect of the two critical paragraphs.

The trial court gave some weight to evidence introduced at the hearing that several different modified or replacement contracts had been offered after the 1970 contract was entered into. In each instance the consent of 75% of the member hospitals having 75% of the beds could not be obtained, and Blue Cross reverted to the 1970 contract instead of attempting to terminate under Section V, paragraph 2. We fail to see the relevancy thereof. The prior actions of Blue Cross cannot be considered as changing the terms

of the existing contract. To modify an existing agreement, either by expressed assent or by assent implied from conduct of the parties, the agreement to modify must be supported by an independent consideration. *Bloch v. Fedak,* 210 Kan. 63, 65, 499 P.2d 1052 (1972).

A contract must be interpreted in light of its particular provisions and every provision material to ascertainment of the intention of the parties must be construed, if possible, so as to be consistent with every other provision and to give effect to all. *Wiles v. Wiles,* 202 Kan. 613, 619, 452 P.2d 271 (1969).

In assessing whether the trial court abused its discretion in granting a temporary injunction the matter at issue is what, if any, force and effect should be given the two provisions of the 1970 written contract, and that in turn is a question of law. *Duffin v. Patrick,* 212 Kan. 772, Syl. ¶ 3, 512 P.2d 442 (1973). Both parties during oral arguments stated that these two provisions of the contract are clear and unambiguous. We agree. The question, then, is simply what is the intent and meaning of the clear words used by the parties in their contract.

We must keep in mind the positions of the parties and the purposes enumerated in the statute, K.S.A. 1979 Supp. 40-1803, authorizing the hospitals to contract with mutual nonprofit corporations to provide hospital services for subscribers. Execution of these contracts is voluntary on the part of the hospitals and Blue Cross. With that in mind we turn to the wording in Section V, paragraphs 2 and 3 of the 1970 contract.

Paragraph 2 states that the agreement may be terminated by either party on prior written notice. There is no limitation imposed as to when termination is possible other than when written termination notice is given; the obligations of the parties shall continue under the agreement for six months following the first of the next month after the notice. This provides a definite ascertainable date for termination which gives the parties six months' time to arrange their business affairs during which period the parties continue to operate under the prior agreement. The right to terminate is a mutual right. The paragraph concludes with a provision for automatic termination at any time the hospital changes ownership or changes the leasing agreement for total operation of the hospital, which provision is not applicable here.

Paragraph 3 is a separate and distinct paragraph of the agree-

ment. It deals with how the agreement may be modified or replaced with a new agreement. Such a modification or replacement of the agreement may be accomplished by Blue Cross when such is approved by 75% of the member hospitals in the Blue Cross service area representing 75% of the beds. Such a modification or replacement must be approved by the Blue Cross Board of Directors. In such case when these requirements are met there is no break in payments for hospital services furnished Blue Cross subscribers, for a change in contract is accomplished without a loss of status as a member hospital.

The two paragraphs contain no reference to each other. There are no apparent reasons why the two paragraphs cannot operate independently of each other. Take a hypothetical case of modification in which 75% of the hospitals with 75% of the beds approve a new agreement. In such case there appears no reason why a hospital in the 25% group which refused to sign the new agreement could not exercise the right to terminate and thereby become a nonmember hospital, rather than be bound by the modified agreement. The choice would be up to the particular hospital. It could either join the 75% group or it could terminate with Blue Cross.

A similar choice would be open to Blue Cross if it should attempt to obtain a modification and fail to obtain approval of the required number of hospitals and beds. Blue Cross should be able to abandon its efforts to obtain a modified contract when that appears futile. Blue Cross should then be able to terminate the old contract with those hospitals who no longer desire to provide hospital services for Blue Cross subscribers under the terms of a new contract. If Blue Cross cannot terminate the contract it would become an agreement in perpetuity for it has no fixed term. Such agreements are frowned upon.

American courts have traditionally taken the view that competent parties may make contracts on their own terms, provided such contracts are neither illegal nor contrary to public policy, and in the absence of fraud, mistake or duress a party who has entered into such a contract is bound thereby. *Wille v. Southwestern Bell Tel. Co.,* 219 Kan. 755, 757, 549 P.2d 903 (1976). This would include any provision for mutual termination of the contract.

The 1970 contract is neither illegal nor contrary to public

policy for it was entered into to comply with a provision in the mutual nonprofit hospital service corporation act, K.S.A. 1979 Supp. 40-1803. The legislature in passing laws sets the public policy for the state. There is no charge by either party of fraud, mistake or duress.

The 1970 contract provided no date for termination of the contract. In place of a definite limitation on the life of the contract the parties agreed to a method of termination by written notice. A review of contract law reveals a traditional distaste for contractual rights and duties between parties unbounded by definite limitations of time. 17A C.J.S., Contracts § 398 (1963). See also *Mildfelt v. Lair,* 221 Kan. 557, 563, 561 P.2d 805 (1977).

In *Johnson v. National Beef Packing Co.,* 220 Kan. 52, Syl. ¶ 1, 551 P.2d 779 (1976), we held:

> "In the absence of a contract, express or implied, between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged."

However, in the present case the parties specified a method of mutual termination, and we see no reason why this right of termination at the will of either party should not be honored by the parties and enforced by this court. See *Batchelor's Building Maintenance Service, Inc. v. Douglas Avenue Corp., Inc.,* 205 Kan. 149, 468 P.2d 189 (1970).

The hospitals argue that sending the termination notice amounted to only an attempt to circumvent the approval requirement in Section V, paragraph 3 necessary for replacement of the contract. In other words, Blue Cross was not sincere in its desire to terminate and was using termination as a subterfuge to accomplish replacement.

When the right to terminate a contract is absolute under the clear wording in the agreement the motive of a party in terminating such an agreement is irrelevant to the question of whether the termination is effective. *Zaidan v. Borg-Warner Corporation,* 228 F. Supp. 669, 671 (E.D. Pa. 1964), *aff'd* 341 F.2d 391 (3rd Cir. 1965); *Kraus v. General Motors Corporation,* 120 F.2d 109 (2nd Cir. 1941).

It was stipulated by the parties and found by the trial court that each of the hospitals had received the written termination notice in November, 1978. Under the clear terms of the 1970 contract the

contract would have terminated on May 31, 1979, except for the temporary injunction issued by the trial court. We hold that the trial court was in error in granting the injunction; however, in order to give the hospitals time to reevaluate their positions with regard to becoming nonmember hospitals and to allow time for Blue Cross subscribers to be advised of their positions, the injunction shall remain in effect until the mandate of this court is spread of record in the court below.

The judgment is reversed and case is remanded to the trial court.

HERD, J., not participating.