ALDERMAN DRUGS, INC., *et al.*, Plaintiffs-Appellants, v. METROPOLITAN LIFE INSURANCE COMPANY, Defendant-Appellee.

First District (4th Division)   No. 85—3607

Opinion filed September 24, 1987.

James P. Chapman & Associates, Ltd., of Chicago (James P. Chapman and Kathleen Hogan Morrison, of counsel), for appellants.

Peterson, Ross, Schloerb & Seidel, of Chicago, and William J. Toppeta and John L. Viola, both of New York, New York (Joseph J. Hasman and Clay H. Phillips, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court: ·

This action was brought on behalf of a class of pharmacies engaged in the retail prescription drug business in Illinois, which are or were "participating providers" under agreements with Metropolitan Life Insurance Company. The contractual arrangement, called the MediMET program, was designed to service the health insurance and prescription drug needs of certain major companies and their employees who belong to Metropolitan's group health insurance plans.

Plaintiffs' action for declaratory judgment was initially dismissed. On appeal from that dismissal, we reversed and remanded, holding that the complaint stated a cause of action, that an actual controversy existed, and that the trial court was to declare the rights of the parties under the agreement. *Alderman Drugs, Inc. v. Metropolitan Life*

*Insurance Co.* (1979), 79 Ill. App. 3d 799, 398 N.E.2d 984.

Following a bench trial on remand, the trial court entered judgment against plaintiffs on their complaint and in favor of Metropolitan. Plaintiffs appeal, contending that (1) Metropolitan's termination of pharmaceutical providers which rejected amendments to the provider agreements constituted a breach of the implied covenant of good faith and fair dealing; (2) Metropolitan should be equitably estopped from terminating providers which rejected amendments to the provider agreements; and (3) the trial court erroneously applied the doctrines of impossibility and commercial frustration to permit Metropolitan to terminate providers which rejected the amendments.

We affirm the trial court.

BACKGROUND

In 1969, Metropolitan introduced MediMET to Illinois pharmacists. Under the program, members of a Metropolitan health insurance group, such as employees of General Motors or North American Rockwell, are entitled to purchase prescription drugs for a set deductible or "co-payment" fee (initially $2, then $3) from participating pharmacies. The pharmacy would then bill Metropolitan for the actual cost of the drugs plus a dispensing fee (initially $2.05 but then raised to $3.35) minus the employee's co-payment.

To become a participating provider under the MediMET plan, a pharmacist executes a MediMET Prescription Drug Agreement (provider agreement). At issue in the pending case are two of the paragraphs of the provider agreement, one of which is a termination at will provision. The other provides that the agreement shall not be amended except upon the mutual, written agreement of the parties. The former provision states:

> "This Agreement shall remain in full force and effect until terminated by either party effective upon at least thirty (30) days written notice to the other, except that METROPOLITAN reserves the right to terminate, effective upon receipt of written notice by PARTICIPATING PROVIDER, for violation of this Agreement or for other good cause."

The other term of the provider agreement, upon which plaintiffs base their claims, states:

> "This Agreement and the Schedule or Schedules attached hereto constitutes the entire understanding between the parties and shall not be altered or amended except in writing signed by both METROPOLITAN and PARTICIPATING PROVIDER."

The MediMET plan was a by-product of collective bargaining ne-

gotiations between General Motors and the United Auto Workers. Metropolitan was called in to implement a plan for providing prescription drugs to the employees at a nominal cost. Subsequently, Metropolitan began soliciting pharmacists to provide the service in areas where General Motors had employees. In time, more employers requested similar plans.

As part of its campaign to contract with pharmacists to provide the service, Metropolitan mailed out information packets with an application and form contract, as well as a fact guide. The fact guide explained some of the particulars of the program, such as the basis of compensation to participating pharmacists, the time period for reimbursement, limitations on drug quantities or refills, and the anticipated increase in the store traffic of the participating providers. In addition, Metropolitan conducted regional meetings with interested pharmacists to explain the details of the plan and communicated with individual pharmacists to address their specific concerns.

From the inception of the MediMET program in 1969 to approximately the beginning of 1977, the relations between Metropolitan and the plaintiff class were apparently amicable. The pending litigation arose after certain pharmacists were terminated from the program after they refused to accept amendments to the plans.

The specifics of the plans for various policyholders arose from collective bargaining between the policyholders-employers and the unions. Generally, Metropolitan would forward any amendments to the providers to accept or reject, with the stipulation that if the provider did not send in a written acceptance or rejection, acceptance would be presumed, especially when the provider continued to send in claims. In practice, this is what occurred, at least in some instances. However, plaintiffs' lawsuit is premised on the fact that some of the pharmacists were terminated when they declined to accept the amendments.

At issue in the pending dispute are the 1977 amendments to two of the plans, General Motors' and Rockwell's. These amendments increased the employee co-payments from $2 to $3 and increased the maximum allowable dosage for seven drugs from 100-unit doses to 200-unit doses. In addition, a new employer, American Shipbuilding Company, was proposed in January 1981. One of the class representatives, Edward Duffy, was terminated in July or August 1981 when he refused to accept American Shipbuilding as a covered employer under the plan.

Plaintiffs objected to the increase in dosage, from 100 to 200-unit maximums, because of the perceived reduction in their profits, since a

customer would come in less often for refills. In addition, the pharmacists believed that the larger dosage was not pharmaceutically appropriate because, when the drugs are taken in modest doses, they will remain on the shelf over six months.

At trial, four members of the plaintiff class testified. All were registered pharmacists who had owned their own pharmacies for years. They testified from their experience as to the general operation of pharmacies in Illinois and to the specific problems they had found in the MediMET plan.

Typically, pharmacies have two distinct parts: the "front end" business, consisting of nonprescription medications, health and beauty aids, medical equipment and the like, and the prescription end. These two parts complement each other, since customers who come in to fill a prescription often buy other items from the front end of the business and those who patronize a particular store for nonprescription needs often will have their prescriptions filled by the same store.

Plaintiffs testified as to a range of grievances they had with the MediMET program. They asserted that, contrary to their expectations and what they were led to believe, they lost money on the program. One of the selling points of the program was that the independent pharmacists who participated would suffer no competition with participating lower-priced chains because the plan customer would pay the same price for the same prescription at either type of business. Representatives of Metropolitan also told interested pharmacists that their front-end business should increase; the pharmacists' dispensing fee would be timely reviewed and adjusted according to increased costs that might arise; the pharmacists would be reimbursed within 30 days after submitting their MediMET claims; and that the plan would limit the dose amount per prescription to a 34-day supply, to prevent the dispensing fees from being diminished.

According to the plaintiffs, Metropolitan failed to disclose to them that they would be terminated if they refused to accept Metropolitan's unilateral amendments. These amendments included the addition to the plan of new covered employers and changes in dosages or covered drugs. Since they were often substantially dependent upon the covered customers they served, many pharmacists accepted these amendments. Those who did not were subject to termination from the program. According to plaintiffs, this was a violation of the provision in the provider agreements which gave them the right to accept or reject amendments.

Plaintiffs further testified that the plan was a burden in that they had increased paper work and attendant costs, that MediMET claims

were not always satisfied during the 30-day period called for under the provider agreement and that they had to explain the plan to their customers. All in all, they were unhappy with the dispensing fees, the slow turnaround on the claims processing, and the fact that they believed they were losing money.

In response, Metropolitan denied have a preexisting "policy" of termination upon a pharmacist's refusal to accept amendments. Rather, it argued that the changes were required by subsequent collective bargaining of the unions and covered employers and that both Metropolitan and the pharmacist were free at any time to terminate the provider agreement upon 30 days' notice. Moreover, since the agreement expressly allows for a pharmacist's professional judgment in deciding the dosage to dispense, an increase in the *maximum* dosage of a drug was not a directive to dispense that amount.

Metropolitan also elicited testimony from the plaintiffs that they had accepted increases in the dispensing fees without first sending in written acceptances of the increase; rather, they continued to submit reimbursement claims reflecting the increase. One of the plaintiffs' class representatives testified that he had accepted the General Motors amendment in substance (increasing the customers' co-payment and increasing the maximum dosages) and submitted claims thereunder. This individual, Tom Gulick, who was not terminated from the program, never dispensed in excess of the 100-unit doses for the relevant drugs, even though the new maximum is 200 units.

Another of the four class representatives, Don Gronewald, testified that he objected to the 200-unit dose because of possible health hazards as well as the economic consequences of dispensing double the dosage for one dispensing fee. However, he had only one General Motors customer. He was terminated after he refused to participate in the General Motors plan as amended. Subsequently, he was invited to rejoin the program, but he elected not to, in part because he had but one customer. He also wanted a higher dispensing fee.

Martin Alderman, one of the pharmacists participating in the Rockwell plan, rejected the proposed Rockwell amendment in 1977 despite the fact that he had no Rockwell customers at the time. Metropolitan addressed his concern with the increased dosage provision by stressing his ability to use his professional judgment in dispensing drugs. It then urged him to execute the amendment. He testified that he did not particularly care that he was terminated from the program, that he had no desire to rejoin the program, and that he in fact had rejected an offer to rejoin.

The last class representative, Edward Duffy, sent Metropolitan a

letter requesting a higher dispensing fee. When he received notice that American Shipbuilding was implementing a MediMET plan he rejected further participation. He testified at trial that he did not care that he was terminated and had no desire to rejoin. Moreover, he retained approximately 70% of his former MediMET customers, whom he charged his usual fees.

In 1979 Metropolitan revised the termination clause of the provider agreements to expressly allow Metropolitan to change the schedule or schedules as required by its policyholders as a result of collective bargaining.

At the conclusion of the testimony, both sides moved for directed finding in their favor and submitted proposed findings of fact and conclusions of law.

The trial court found in favor of Metropolitan, noting that plaintiffs had voluntarily entered the program to stay competitive in the business. The court held that the provider agreement expressly and unambiguously allowed for mutual termination at will. Among other findings, the court found persuasive the fact that Metropolitan could not prevent the schedules from changing upon the collective bargaining negotiations of the covered employer and employees and that, once amended, there was simply no other plan in existence for Medi-MET customers to take advantage of, since the old schedules would become obsolete.

The trial court also found that Gulick had accepted the modification by performing under it and accepting payment from Metropolitan, and that the other three class representatives had no desire to reenter the program.

The trial court found no violation of "any equitable duty or right" and therefore gave effect to the termination at will clause. Accordingly, the court ruled against plaintiffs on their complaint.

OPINION

Plaintiffs contend that two doctrines should bar Metropolitan from terminating participating providers who rejected amendments to the plans: the covenant of good faith and fair dealing and equitable estoppel.

In essence, plaintiffs assert that the duty of good faith and fair dealing, which is a covenant implied in every contract, should operate as a limitation upon Metropolitan's right to terminate the provider agreements. They argue that to allow Metropolitan to terminate those providers who reject amendments is to render meaningless paragraph 14 of the agreement, which provides for the acceptance or rejection of

amendments by participating providers.

Plaintiffs rely on *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683, the seminal case interpreting the implied covenant of good faith and fair dealing. As a matter of construction, the Illinois Supreme Court held that this covenant requires that "where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted." (15 Ill. 2d 272, 286, 154 N.E.2d 683, 690.) In that case, the individual defendants caused the corporation to redeem corporate debentures, which rendered worthless plaintiff's option to purchase the debentures. Although the act of redeeming the debentures was not in and of itself unlawful, the court held that the plaintiff's purchase option could not be destroyed by the corporate redemption of the debentures because the parties had to be presumed to be dealing in good faith when they entered the contract and the only way to preserve the value and purpose of the transaction was to construe the agreement in consonance with that intent.

In the pending case, the apparent conflict in the two provisions has little to do with good faith or bad faith. Neither provision is ambiguous on its face and neither requires substantial construction. The termination at will clause is an unremarkable example of a perfectly acceptable contractual provision. So, too, is modification by mutual agreement a fairly common feature of contracts. The problem is reconciling the two paragraphs, which have different aims and different applications.

■ Terminable at will contracts, such as most employment agreements, are generally held to permit termination for any reason, good cause or not, or no clause at all. (*E.g., Martin v. Federal Life Insurance Co.* (1982), 109 Ill. App. 3d 596, 440 N.E.2d 998; *Gordon v. Matthew Bender & Co.* (N.D. Ill. 1983), 562 F. Supp. 1286.) Thus, employees who allege that they have been terminated in "bad faith" cannot base a cause of action on a violation of the good-faith-and-fair-dealing convenant.[1] In *Gordon v. Matthew Bender & Co.* for example, the court rejected the argument that the duty of good faith and fair dealing should override the clear right to terminate at will, since "[n]o obligation can be implied *** which would be inconsistent with other

---

[1]In limited instances, a terminated employee has a right of action based on a theory of retaliatory discharge. (*E.g., Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) No Illinois court, however, has recognized a separate tort cause of action premised on a violation of the implied covenant of good faith and fair dealing.

terms of the contractual relationship. Thus, \*\*\* plaintiff's employment was at will, a relationship in which the law accords the employer an unfettered right to terminate the employment at any time. \*\*\* [I]t would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination." (562 F. Supp. 1286, 1289-90.) The court therefore held that the employee did not have a legal claim against his employer, despite his allegations that defendant had reduced his sales territory while increasing his sales quota, which in turn made good sales performance impossible.

In *S & F Corp. v. American Express Co.* (1978), 60 Ill. App. 3d 824, 377 N.E.2d 73, the court reversed entry of a preliminary injunction preventing American Express from terminating a dance parlor pursuant to a termination at will clause. The plaintiff argued that American Express should not have been allowed to terminate the agreement because the parlor had relied upon the continuation of the agreement in building its business. In rejecting this contention, the court ruled that the termination provision must be enforced according to its terms because to do otherwise would be to rewrite the parties' contract.

■■ If a contract does not have a specified duration, it will be considered to be terminable at the will of either party. (*Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.* (1984), 130 Ill. App. 3d 798, 474 N.E.2d 1245.) In this case, the parties explicitly intended to provide for this eventuality without the need to itemize specific reasons or causes for termination.

It would appear, therefore, that the termination clause was intended as a safety valve for both sides. Disgruntled or uninterested participating providers could drop out of the program at any time without further obligation. Metropolitan could likewise terminate any pharmacists whose refusal to accept an amended plan would render their continued participation impracticable. Here, the pharmacists who did not accept a new covered employer obviously would be unable to service the employees of the new employer and those who rejected the increased dosage guidelines would risk alienation of those customers who demanded the maximum dosage.

Moreover, the unions and covered employers were the ones who negotiated the modifications to the schedules incorporated into the provider plans. Metropolitan was charged with implementing the changes and administering the program. The pharmacists were charged with providing the necessary services. It may be precisely because of the changing nature of the collective bargaining and other

business factors that the termination at will clause should be considered essential; it offers as much protection to the pharmacists who reject the schedule changes as it does to Metropolitan.

The remaining question, therefore, is whether the amendment provision of the provider agreement furnishes a basis for limiting Metropolitan's right to terminate.

■ Examination of the language of paragraph 14 of the provider agreement reveals that it is essentially an "integration" clause intended to express that the written contract embodied the complete agreement of the parties and that further or future modifications would be agreed upon in writing signed by the parties. In parol evidence parlance, integration clauses are construed as the parties' intention to express their final and complete understanding of the entire contract and thereby rely exclusively on the terms of the document in those situations in which one party attempts to alter or contradict a term of the contract by using extrinsic evidence. *E.g.,* *Pecora v. Szabo* (1981), 94 Ill. App. 3d 57, 418 N.E.2d 431.

In spite of the language of paragraph 14 requiring modifications to be in writing, often parties modify their agreement orally or by their subsequent actions despite the written modification provision. *E.g.,* *South Shore Amusements, Inc. v. Supersport Auto Racing Association* (1985), 136 Ill. App. 3d 284, 483 N.E.2d 337; *Estate of Kern v. Handelsman* (1983), 115 Ill. App. 3d 789, 450 N.E.2d 1286.

In this case, the evidence indicates that at least one class representative accepted the amendments in question by performance, thereby ratifying the modification. (See *Davison v. Board of Trustees of Carl Sandburg College, District No. 518* (1985), 132 Ill. App. 3d 980, 478 N.E.2d 3 (a party cannot repudiate a contract after accepting modifications).) All plaintiffs accepted the increases in their dispensing fees without signing a formal modification document. Some plaintiffs in the class presumably did not object to the modified schedules and have continued in the program without any regard for the instant litigation.

We believe that the pertinent law requires us to give effect to the termination at will clause without reading in a restriction based on paragraph 14. In *Garber v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 675, 682, 432 N.E.2d 1309, the court held as follows:

> "A contract terminable at the will of either party can be modified at any time by either party as a condition of its continuance [citations] ***."

In *Augusta Medical Complex, Inc. v. Blue Cross of Kansas, Inc.* (1980), 227 Kan. 469, 608 P.2d 890, a group of hospitals were partici-

pating providers of services under a written contract with Blue Cross. As in the pending case, the provider agreements contained a termination at will clause. The agreements further provided that any modification in the contracts required 75% approval of the area hospitals representing 75% of the hospital beds. In 1977 Blue Cross presented a new contract to the providers but was unable to obtain 75% approval. Therefore, it terminated those providers who had not approved of the new contract and asked the remaining hospitals to sign the new agreement. Subsequently, the terminated providers obtained a preliminary injunction prohibiting Blue Cross from terminating them. The Kansas Supreme Court, however, reversed, holding that the explicit right to termination was unlimited and mutual. It further noted that the two seemingly conflicting provisions in the contract contained no references to each other and could operate independently of each other. Hence, if Blue Cross obtained 75% approval of a modified contract and the remaining 25% did not wish to be bound thereunder, they could exercise their termination rights. Conversely, Blue Cross should have the right to terminate providers who did not accept a modification. The court recognized that if Blue Cross could not terminate the providers, it would be bound in perpetuity to the original agreement, a result not favored in the law.

■ We do not believe that the contractual principles involved in the present case differ substantially from those expounded in the *Augusta* and *Garber* decisions. The Kansas Supreme Court found unpersuasive the hospital's argument that Blue Cross subverted the approval requirement by terminating noncooperating providers, stating, "When the right to terminate a contract is absolute under the clear wording in the agreement the motive of a party in terminating such an agreement is irrelevant to the question of whether the termination is effective." 227 Kan. 469, 476, 608 P.2d 890, 895.

The fact that in the pending case some participating providers were terminated for rejecting amendments to the schedules does not rise to the level of bad-faith dealing. Plaintiffs have not sustained their burden of proving that their inability to reject unilateral amendments and not be terminated amounts to a violation of the implied covenant of good faith and fair dealing.

ESTOPPEL

■ Plaintiffs' second, related argument is that Metropolitan should be equitably estopped from terminating providers who reject amendments to the plans. To form the basis of estoppel, the party so claiming must establish that the opposing party knowingly made un-

true statements or omissions of material fact that were intended to induce action thereon; that the statements or conduct did in fact induce action and that the party seeking relief was unaware of the falsity of the statements and relied upon them to his detriment. *E.g.*, *Stewart v. O'Bryan* (1977), 50 Ill. App. 3d 108, 365 N.E.2d 1019; *Shockley v. Ryder Truck Rental, Inc.* (1979), 74 Ill. App. 3d 89, 94, 392 N.E.2d 675, 678 (definition of estoppel is the effect of voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might otherwise have existed as against another person who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse and who, for his part, acquires some corresponding rights).

Plaintiffs contend that Metropolitan had a secret policy of terminating providers who rejected amendments to the agreement, that they induced the pharmacists to join the program without disclosing this policy, and that plaintiffs relied to their detriment on Metropolitan's representations as to increases in the dispensing fee, increased business opportunities, prompt reimbursement, limited dosages, and the mutual acceptance of proposed amendments.

We do not find that the record bears out plaintiffs' claim that Metropolitan knowingly misled them with regard to any of the above representations or supposed omissions or that they relied upon these representations to their prejudice. The decision to make expenditures and change position in reliance on oral promises is insufficient to form the basis of estoppel in the absence of fraud or misrepresentation. (*Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.* (1984), 130 Ill. App. 3d 798, 474 N.E.2d 1245.) Of course, Metropolitan's marketing plan persuaded pharmacists to join the MediMET program; that was its purpose. Nevertheless, plaintiffs testified that one of the major reasons they joined was to stay competitive. In addition, there is evidence that they did have increased business opportunities, they did receive increased dispensing fees, and they did have limitations on dosages. Their dissatisfaction with the fees, the increased dosages, the delays in reimbursement, the burdensome paper work, and their stated loss of money are separate matters that are immaterial to the issues presented (although these complaints would be reasons for them to exercise their own termination rights).

■ As for Metropolitan's alleged "preexisting" policy of terminating providers who rejected amendments, plaintiffs did not establish that there was such a policy in existence at the time that they entered the program or that such a policy was deliberately omitted from explanations of the program in order to induce plaintiffs to join. Nor is

it clear that they would have declined to participate in the program had they been made explicitly aware that their rejection of amendments would become a ground of termination; they had to have known that they could be terminated at any time for any reason as long as Metropolitan gave them 30 days' notice in writing. Therefore, we find no detrimental reliance on the purported nondisclosure of the termination "policy."

IMPOSSIBILITY AND COMMERCIAL FRUSTRATION

Plaintiffs' final argument is that the trial court erroneously applied the doctrines of impossibility and commercial frustration to allow Metropolitan to terminate the providers. We do not find that the court used these doctrines in reaching its decision; in fact, plaintiffs admit that Metropolitan abandoned these defenses after raising them in their unsuccessful motion for summary judgment.

The trial court clearly found that plaintiffs had not sustained their burden of proving that the terminations were made in bad faith or that Metropolitan should be estopped from exercising its legal right to terminate under the provider agreement. The impossibility and commercial frustration doctrines are not material to the court's determination, since they are at best affirmative defenses which would operate to legally discharge a party's performance under a contract. The discharge of Metropolitan's performance is not an issue in this case.

We hold that the trial court's findings were not against the manifest weight of the evidence and that its conclusions of law were not erroneous. Accordingly, we affirm.

Affirmed.

McMORROW, P.J., and JOHNSON, J., concur.