ROBERT LANGENDORF *et al.*, on Behalf of Themselves and All Other Persons and Entities Similarly Situated, Plaintiffs-Appellees, v. IRVING TRUST COMPANY, Defendant-Appellee (Stanley Epstein *et al.*, Plaintiffs-Appellants).

First District (3rd Division)   No. 1—90—0319

Opinion filed December 30, 1992.

Edna Selan Epstein, of Chicago, for appellants.

Larry D. Drury, Ltd., of Chicago, for appellees Robert Langendorf and Cynthia Langendorf.

JUSTICE CERDA delivered the opinion of the court:

Following a settlement agreement on a national class action, two class members, plaintiffs, Stanley and Harriet Epstein, objected to the terms of the agreement. They were denied leave to intervene, to conduct discovery, represent other objectors at the fairness hearing, and negotiate a better settlement. On appeal, they assert that (1) the settlement was not fair and reasonable; (2) the trial court did not conduct a genuine fairness hearing; and (3) the class notices were fatally defective. We affirm.

In 1987, defendant, Irving Trust Company (Irving), established the One Wall Street Account (Account), which was a high-yield money market account. The Account attracted large balances, averaging approximately $40,000. The Account's provisions were governed by a written contract, the One Wall Street Account Agreement (Agreement). Initially, Irving paid Account depositors a specified number of "basis points," which is one-hundredth of a percent, above the Donoghue Fund money market rate (Fund), a well-known average of other money market funds. The depositors were classified into four levels and paid the following interest on their balances:

| Level | Balance | Interest |
| --- | --- | --- |
| Level A | $15,000 or more | Fund rate plus 50 basis points (0.50%) |
| Level B | $2,500 to $14,999 | Fund rate plus 25 basis points (0.25%) |
| Level C | $25 to $2,4999 | 5.25 % |
| Level D | Under $25 | No interest |

Paragraph 24 of the Agreement provides:

"24. Closing or Reducing Your Account:

We may close your account at any time for any reason."

In addition, the Agreement provided for any prospective changes. Paragraph 33 provided:

"33. Change of Terms:

We may change this agreement at any time, but we will give you notice of any changes as required by law."

In 1989, after giving advance written notice, Irving changed the Account's interest rate structure. The following payment system was adopted effective April 14,1989:

| Level | Balance | Interest |
| --- | --- | --- |
| Level A | $100,000 and above | Fund rate plus 25 basis points (0.25%) |
| Level B | $50,000 to $99,999 | Fund rate plus 10 basis points (0.10%) |
| Level C | $2,500 to $49,999 | Fund rate |
| Level D | Under $2,500 | No interest |

Irving announced that these rates would remain in effect until May 26, 1989. After that date, the interest rates would be set weekly based on market conditions.

On May 18, 1989, plaintiffs Robert and Cynthia Langendorf, who were Account depositors and Illinois residents, filed a class action complaint against Irving. In their complaint, plaintiffs alleged that Irving had breached the Agreement, made misrepresentations and omissions to depositors in the Account's promotional materials, and engaged in conduct that violated the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*) and the Illinois Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1989, ch. 121½, par. 311 *et seq.*). According to plaintiffs, those claims arose when Irving changed the Account's provisions. The lawsuit was later certified as a nationwide class of all the Account's depositors.

After the complaint was filed, the parties' attorneys met to discuss whether the suit could be settled without lengthy and expensive proceedings. According to the attorneys, the parties exchanged information and discussed their respective legal positions, including the impact of the *Garber v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 675, decision and the Agreement's provisions on plaintiffs' prospects for recovery.

After weeks of negotiations, the parties reached an agreement in principle. No formal discovery was conducted. The statement of settlement in principle was filed with the circuit court on July 26, 1989, and presented at a pretrial conference on August 15, 1989. The negotiations

continued, culminating in the execution of a settlement agreement in September 1989. On October 25, 1989, the trial court granted preliminary approval of the stipulation of class action settlement and the form and manner of notice. A fairness hearing was set for January 17, 1990.

Throughout the negotiations, Irving denied any wrongful conduct and disclaimed any liability to plaintiffs. In exchange for release of the claims of the class, the settlement granted the class the following benefits:

(1) Irving agreed to the certification of a settlement class.

(2) Irving paid all costs of the notice to the 21,205 members of the settlement class, totalling over $164,000.

(3) Irving provided the class members additional bank services, including:

(a) Priority Savings Account.

A high-yield savings account. Irving agreed to waive for two years the $5-per-month maintenance charge on any account with less than a $2,500 balance. Instead, the $5 fee would be charged only if the account balance was less than $500. There is also an option of one of two associated checking accounts, a non-interest-bearing account and an interest-bearing NOW account with a $5,000 minimum balance.

(b) Credit Card.

Irving agreed to waive its annual fee ($40 for gold cards and $18 for regular cards) for one year for one credit card, beginning on the date the card is issued. Class members would be charged finance charges of .4% below the usual rate on outstanding balances for two years.

(4) Irving agreed to pay an interest rebate from April 14, 1989, through August 31, 1989. Irving agreed to restore the level A, B, and C thresholds originally in effect and to pay the interest rebate as follows:

| Level | Balance | Interest |
| --- | --- | --- |
| Level A | $15,000 or more | Difference between interest actually received and 10 basis points (0.10%) above the Fund average |
| Level B | $2,500 to $14,999 | Difference between interest actually received and 5 basis points (0.05%) above the Fund average |
| Level C | $25 to $2,499 | Difference between interest actually received and 1.3125%. |

(5) From August 31, 1989, through the termination of the Account in early 1990, class members with funds on deposit would receive interest at the rate in effect for Irving's Priority savings account.

Irving mailed notices to all potential class members, advising them of the settlement terms, how a class member could opt out of the settlement class, and how a class member could object to the settlement terms. The notice stated that a request to be excluded from the class or to object to the settlement terms had to be filed in writing no later than December 15, 1989. The trial court declared that unless an objecting party served and filed written objections prior to December 15, 1989, the class member would be deemed to have waived any objection and would be forever barred from raising an objection in any judicial proceedings.

Of the 12,747 class members who submitted claim forms, 5,293 requested a priority savings account and 851 requested a credit card. Interest rebates were given. In addition, Irving did not reduce the interest rate paid to the Account depositors in July and August even though they were below the market rates. Irving treated those rates as a prepayment to the settlement class of approximately $82,468 of the $350,859 total interest rebate.

The Epsteins did not request to opt out of the class. On December 13, 1989, they filed a motion to intervene for the purpose of objecting to and challenging the terms of the proposed settlement. On December 18, 1989, the trial court found the motion deficient and denied the motion without prejudice.

On December 21, 1989, the Epsteins refiled their petition to intervene. Plaintiff class members then filed a motion to strike the petition and supporting documents. The trial court granted the motion and found that the late intervention would lend nothing to the case. The Epsteins, however, were given full opportunity to object at the fairness hearing.

On January 17, 1990, a fairness hearing was conducted by the trial court. The only objectors present were the Epsteins. The trial court considered all the written objections that had been filed as well as the statements by class members who were in favor of the settlement. The trial court approved the settlement, finding that it is fair and reasonable, the settlement's benefit to the class exceeds the likely benefit of litigation to the class, the filed objections are groundless, Irving was to pay the attorney fees, and the attorney fees are reasonable.

On appeal, the Epsteins assert that the trial court abused its discretion approving the class action settlement because its terms are not fair, reasonable, or in the class' best interest. According to the Epsteins, the settlement does not meet the criteria for reasonableness or adequacy in that (1) the relief is much less than the solicitations offered; (2) the relief is substantially less than sought in the complaint; (3) no discernible discovery was conducted; (4) the parties negotiated the attorney fees and class relief simultaneously; and (5) the settlement does not protect a subclass comprised of those depositors who closed their Account prior to April 14, 1989, when the interest rebate period began.

First, the Epsteins contend that the interest rate rebate is illusory because it is to be paid only on deposits from April 14, 1989, through August 31, 1989, a 4½-month period, and it is less than the original guaranteed interest rate above the Donoghue Fund Money Market Rate. Further, the Epsteins claim that the interest rate paid during that period was comparable to rates other banks were paying. Although Irving calculated the rebate's worth at $350,858.88, the Epsteins maintain that only $82,468.27 was paid and that no further rebate money was forthcoming. There is no support in the record for the Epsteins' contentions. Instead, they state conclusions and suppositions.

The Epsteins also assert that the alternative benefits offered are illusory. The benefits include a priority account with a checking account. Irving would waive the usual $5-per-month fee on accounts with deposits between $500 and $2,500. For any accounts with less than $500, there was no waiver. The Epsteins contend that this is an illusory benefit because most of the class members had more than $2,500 in the account, which would not involve any fee. Furthermore, the Epsteins argue, the depositors were lured to place rather large amounts of money into the account by offering advantageous interest rates, and only 5,293 class members, or less than 25% of the class, requested the priority account. Therefore, Epsteins conclude, the benefit is valueless to the class. Again, the Epsteins do not cite evidence in the record for their arguments. Instead, they rely on mere conclusions and assumptions.

Irving also offered a credit card to the class members. The annual fee was waived for one year and the interest rate would be .40% less than the usual interest rate for two years. The Epsteins maintain that this credit card benefit is illusory because many other banks were offering no-fee credit cards and most of the

class members had all the credit cards they wanted or could use. The only support for their conclusions is that only 851 class members requested a credit card.

The Epsteins also argue that the .40% reduction of interest is illusory because the minimum interest is 14%, which is higher than Irving pays on deposits. In addition, the Epsteins remark, the class members are able to pay off their entire balance every month and often do so because the interest is no longer tax deductible. As with their other arguments, the Epsteins do not base their conclusions on evidence in the record.

The Epsteins argue that the trial court abused its discretion when it did not require the proponents of the settlement to address those concerns raised by the objectors. The Epsteins conclude that the failure to include a real and reasonable interest rebate, comparable to the promised rate, as an essential part of the settlement, could only be justified if the compensating noncash benefits are real rather than illusory.

The Epsteins maintain that the settlement was not fair under a nine-step test for judging fairness of a settlement, which is (1) the strength on the merits balanced against the amount offered in settlement (the Epsteins argue that this criterion is in plaintiffs' favor since the amount of the settlement is illusory); (2) defendant's ability to pay (the Epsteins contend that the bank could pay the promised interest for a reasonable fee since the bank is presumably profitable); (3) the complexity, length, and expense of future litigation (the Epsteins claim that the litigation would have been negligible); (4) amount of opposition to the settlement (the Epsteins contend that 44% of the class members objected because they did not file claim forms); (5) presence of collusion in reaching settlement (the Epsteins contend that this is shown in the speed of the settlement and the size of the legal fees compared to the size of the nonexistent class benefits); (6) reaction of class members to the settlement (the Epsteins claim that the 25 objecting members were vocal and outraged); (7) opinion of competent counsel; (8) stage of proceedings and amount of discovery completed (the Epsteins argue that the unseemly haste of the settlement was not in the interest of justice since no discovery was conducted and not even an answer was filed); and (9) whether the settlement initiates or authorizes questionable or illegal conduct (the Epsteins claim that the settlement authorizes illegal conduct because the underlying issue will not be litigated).

In response, Irving asserts that the Epsteins ignore the central issue, which is the relative merits of the underlying complaint, including the Agreement's express terms and the holding in the *Garber* decision, where a dismissal of a class action was affirmed because financial institutions can change account terms after proper notice. Irving concludes that the settlement is fair and reasonable. We agree.

■■ A settlement compromising conflicting positions in class action litigation serves the public interest. (*People ex. rel. Wilcox v. Equity Funding Life Insurance Co.* (1975), 61 Ill. 2d 303, 317; *Armstrong v. Board of School Directors* (7th Cir. 1980), 616 F.2d 305, 313; *Alliance to End Repression v. City of Chicago* (N.D. Ill. 1981), 91 F.R.D. 182, 196.) The standard to be used in evaluating the compromise settlement of a class action is that the agreement must be fair, reasonable, and adequate. *Wilcox*, 61 Ill. 2d at 317; *Waters v. City of Chicago* (1981), 95 Ill. App. 3d 919, 925.

■ Since the settlement is a compromise, the trial court may not decide the merits of a case, attempt to resolve disputed issues of fact or law, or substitute its own judgment for that of the parties. (*Wilcox*, 61 Ill. 2d at 316; *Armstrong*, 616 F.2d at 314-15.) Instead, the trial court must view the settlement as a whole, considering all relevant factors in assessing the compromise. (*Wilcox*, 61 Ill. 2d at 319.) While courts and commentators have suggested a variety of tests to evaluate the fairness of a class action settlement, it is generally agreed that the most important factor is the comparison of the terms of the compromise with the likely results of the litigation. *Wilcox*, 61 Ill. 2d at 317. See also *Armstrong*, 616 F.2d at 314; *Alliance to End Repression*, 91 F.R.D. at 196.

In the *Wilcox* case the court stated:

> "The Supreme Court has directed that a judge reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated' and to 'form an educated estimate of the complexity, expense, and likely duration of such litigation *** and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.'" *Wilcox*, 61 Ill. 2d at 317, quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson* (1968), 390 U.S. 414, 424-25, 20 L. Ed. 2d 1, 10, 88 S. Ct. 1157, 1163.

In considering the likely results of the litigation, we believe that the chance of plaintiffs' success on the merits was small. Not only did the Agreement's "change of terms" and "cancellation" provisions explicitly allow the modifications (*Garber*, 104 Ill. App. 3d at 682), but Irving's conduct was also permitted by the doctrine that a contracting party has the power to terminate indefinite contracts and to make prospective changes to the agreement's terms. (*Garber*, 104 Ill. App. 3d at 680-85.) Where no definite time is fixed during which an executory contract shall continue in force, it is terminable at the will of either party and can be modified at any time as a condition of its continuance. *Alderman Drugs, Inc. v. Metropolitan Life Insurance Co.* (1987), 161 Ill. App. 3d 783, 791; *Garber*, 104 Ill. App. 3d at 682.

In *Garber*, issuers of credit cards altered the account terms to impose additional charges and enact other terms unfavorable to the cardholders. (*Garber*, 104 Ill. App. 3d at 677.) Plaintiffs claimed that the changes constituted a breach of the credit card agreements. (*Garber*, 104 Ill. App. 3d at 677.) The court found that the cardholder agreements were terminable at will by virtue of their cancellation provisions. (*Garber*, 104 Ill. App. 3d at 682.) Therefore, the agreements could be modified at any time as to future transactions, the court concluded. *Garber*, 104 Ill. App. 3d at 683.

The Epsteins argue that the *Garber* case is not applicable because the facts are not comparable to this case. We disagree. Although the court in *Garber* held that the issuance of a credit card is only an offer to extend credit, not the creation of a contract, the court did not limit its ruling to credit card cases. If the credit card agreement was a valid contract, the court held that it was terminable at will because the contract was for an indefinite duration and included a cancellation clause. (*Garber*, 104 Ill. App. 3d at 679-83.) Similarly, in this case, the Account was terminable at will because the Agreement was for an indefinite duration and included a cancellation clause.

■ We conclude that the trial court did not abuse its discretion in approving the settlement. (*Wilcox*, 61 Ill. 2d at 317.) It is apparent that some benefit was afforded to all members of the class through the interest rebate and other alternative bank benefits offered. When these benefits are weighed against the slim probability of success on the merits of the case and the cost and duration of litigation if a compromise had not been effected, we

conclude that the trial court properly determined that the settlement was adequate, fair, and reasonable.

Next, the Epsteins assert that an entire subclass is not protected. The Epsteins characterize the subclass as those depositors who withdrew all their deposits before the rebate period began.

We reject this argument. There is no evidence presented in the record regarding the number of people, if any, who are part of any alleged subclass. Even the Epsteins admit that they have no evidence of how many depositors withdrew their money before April 14, 1989. Furthermore, any such class members were eligible for the benefit of the bank services.

Next, the Epsteins challenge the $125,000 in attorney fees as being unconscionably excessive for the benefits conferred, thus resulting in an abuse of discretion by the trial court.

In *Fiorito v. Jones* (1978), 72 Ill. 2d 73, the court stated:

> "When the court has determined the number of hours which benefit the class, it must then value the services by fixing a reasonable hourly rate for each attorney, taking into account the nature of the services performed, the complexity of the undertaking and the hourly fee charged for similar services by attorneys with similar skills and qualifications. *** The appropriate hourly rates are then multiplied by the hours expended. The product of this multiplication is referred to as the 'lodestar' computation." *Fiorito*, 72 Ill. 2d at 90.

■ Although the Epsteins recognize that multipliers are permissible in class actions (*Fiorito*, 72 Ill. 2d at 90), they argue that this multiplier was improper because the likelihood of plaintiffs' success on the merits was high and the actual benefits conferred to the class were minimal.

Application of a multiplier depends on two factors: the contingent nature of the class' recovery (an unlikely recovery justifying an increased fee) and the quality of the benefit to the class. (*Waters*, 95 Ill. App. 3d at 926.) The contingent nature is examined in light of the probability of the plaintiff's success at the time the suit was filed. *Waters v. Chicago* (1981), 111 Ill. App. 3d 51, 59.

■ Although it is unusual for such a quick settlement as occurred in this case, the settlement obtained a favorable benefit to the class without lengthy, costly litigation. Even with no formal discovery conducted, the parties exchanged informal discovery, evaluated the case's strengths and weaknesses, and obtained a favorable settlement without any expense to the class. As we dis-

cussed earlier, we believe that the likelihood of plaintiffs' success on the merits was low and the actual benefits conferred to the class were adequate. Therefore, we conclude that the trial court did not abuse its discretion in approving the attorney fees. *Lurie v. Canadian Javelin Ltd.* (1982), 93 Ill. 2d 231, 239.

■■ Next, the Epsteins claim that the trial court did not conduct a genuine fairness hearing and that the class notice was fatally defective. The Epsteins waived these claims of error. They participated in the fairness hearing, but did not raise any objection to the notice or proceedings. Therefore, they cannot now raise those objections on appeal.

■■ Next, the Epsteins mistakenly argue that the proponents never addressed the written objections from 25 class members. The record indicates that Irving addressed the written objections in its memorandum supporting the settlement.

■■ Finally, we reject the Epsteins' assertion that the trial court abused its discretion by refusing to permit them to intervene in the class action. It is well established that disallowance of intervention in a pending lawsuit will not be overturned on appeal unless there is a clear abuse of discretion. *Waters,* 111 Ill. App. 3d at 60; *Waters,* 95 Ill. App. 3d at 923.

The Epsteins have not demonstrated that the trial court's denial of their eleventh-hour petition was an abuse of discretion. Their request came at a late date, and they did not present any reason why they had to intervene. In addition, the Epsteins were allowed to fully participate as objectors in the fairness hearing. Therefore, we conclude that the trial court did not abuse its discretion.

Based on the foregoing, the circuit court judgment is affirmed.

Affirmed.

GREIMAN, P.J., and TULLY, J., concur.